UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Ashmark Construction, LLC,   Chapter 11
                             Case No. 25-46693-tjt
           Debtor.           Hon. Thomas J Tucker
_____/

**OBJECTION TO CONFIRMATION
OF PLAN OF REORGANIZATION**

*NOW COMES* Richard Penington ("Mr. Penington" or "Creditor"), by and through his attorneys, Morris & Morris Attorneys, P.L.L.C., who objects to the Debtor's, Ashmark Construction, LLC's ("Asmark" or "Debtor"), plan of reorganization (Doc 49). Creditor objects to the plan for all the reasons set forth herein.

## Introduction

Mr. Penington's claim is based upon an advanced payment of construction trust funds to the Debtor. Debtor refused to repay those trust funds, resulting in a lawsuit filed in January of 2023. In 2023 and 2024, *after* Mr. Penington's lawsuit was filed, Ashmark made over seven hundred thousand ($700,000) dollars of distributions and loans to its members, instead of repaying Mr. Penington for his construction advance payment. Within weeks *after* Mr. Penington prevailed in the state court lawsuit, Ashmark filed

for bankruptcy and claimed that it lacked money to repay the construction trust funds that Mr. Penington had paid to Ashmark. Debtor's plan fails to account for these payments.

### Creditor's Claim

1. Creditor holds a claim for $349,975.26.

    a. The claim of Mr. Penington is comprised of a construction trust fund "overpayment" of $222,736.46 (the "Overpayment") and prejudgment interest in the amount of $23,521.60, plus post-judgment interest and attorney's fees. The Debtor listed this claim in its Schedule E/F for $222,736.46, indicating it is contingent, unliquidated, and disputed. However, Mr. Penington's claim, except for attorney's fees, was liquidated by the Oakland County Circuit Court in case no. 2023-198433-CZ (the "Litigation"). The Litigation involved an action brought by the Creditor against the Debtor for breach of contract and other claims. The Litigation went through trial, and on June 13, 2025, the state court granted a judgment in favor of Mr. Penington and against Ashmark. **Exhibit 1**. The state court used the term "overpayment" to describe the applicable building contract fund paid by the Creditor, in advance of construction work being performed by Ashmark, which the Debtor was liable to repay. Under Michigan law (being MCL § 570.151, et seq.), the Overpayment, advanced by Mr. Penington, consisted of funds to be

held in trust by the Debtor. These trust funds were not returned by the Debtor upon cancellation of the underlying building contract.

  b. Creditor filed a proof of claim, No. 4, on October 6, 2025, for a total amount of $349,975.26, which includes attorney fees in the amount of $103,717.20. **Exhibit 2**. (Exhibit 1 to this objection is exhibit 2 to the proof of claim, so exhibit 2 to the proof of claim is omitted). Creditor is entitled to attorney fees pursuant to MCR 2.405(D) because he made offers of judgment during the Litigation, which the Debtor rejected. **Exhibit 3**. After trial, the Creditor was awarded an amount greater than the Creditor's applicable offers of judgment. **Exhibits 1 and 3**.

  c. Mr. Penington has not yet been awarded attorney fees against Ashmark because the Debtor filed its chapter 11 petition on June 30, 2025, before the entry of an award of attorney fees in the Litigation. The Creditor's attorney had prepared a draft motion for allowance of the attorney's fees, pursuant to MCR 2.405(D), which would have been timely filed as part of the Litigation, but which motion could not be filed once the automatic stay was put into effect. A copy of the draft motion is attached as **Exhibit 4**.

  d. In the Litigation, the Creditor also asserted other amounts owed to him. The state court did not include those amounts in its calculation

of Creditor's damages, but Creditor reserves the right to include those in his claim.

**Facts Relevant to Creditor's Objection to Plan Confirmation**

2. The following facts show that: Mr. Penington paid Ashmark to perform construction work; Ashmark did not use all those funds to perform the job; Ashmark kept Creditor's funds; and Ashmark wrongfully used those funds to enrich its members at the expense of Mr. Penington.

    a. Mr. Penington owns a motorsport garage, Unit 197 at the M1 Concourse, which is located at 1 Concourse Drive, Pontiac, Michigan 48341.

    b. On or around September 14, 2021, Penington signed Ashmark's proposal to construct the Project's mezzanine for $219,276.00. **Exhibit 5**. On September 23, 2021, Mr. Penington and Ashmark signed a Service Contract for the construction of the steel mezzanine for $219,276.00 (the "Mezzanine Contract"). **Exhibit 6**.

    c. Another portion of the applicable garage construction (the "Project") pertained to the construction of a carbon fiber "feature wall", which work was given to IXO Carbon Composites to perform. The remainder of the Project's construction was to be performed by Ashmark. On or around November 24, 2021, Ashmark and Mr. Penington signed a second Service Contract, which related to the interior build-out work (the "Interior Build Out

Contract"). **Exhibit 7**. The cost of the interior build-out work was based upon a preliminary budget of $1,827,622.95. **Exhibit 7**.

      d.    On November 24, 2021, Asmark's principal, Martin Renel, sent an e-mail with the Interior Build Out Contract stating: "Since Kevin's team is still modifying the final plans, we know that there will be *minor changes* to finishes, design, etc. that will affect costs and final selections" (emphasis added). **Exhibit 8**.

      e.    The Mezzanine Contract and the Interior Build Out Contract (collectively the "Contracts") both indicate that "time is of the essence". **Exhibits 6** and **7** on page 2, section 5. However, Ashmark did not proceed with its work promptly. No physical construction activity began on the Project until around December 23, 2021, roughly three (3) months after the Mezzanine Contract was signed. It was around this time that Ashmark requested a change order from Penington, indicating that there were unexpected conduits located in the Project's foundation and that it would cost an additional $10,665.00 to address that issue. **Exhibit 9**. Mr. Penington immediately agreed to pay the extra cost to keep the project moving forward.

      f.    In January of 2022, before performing essentially any of the work in connection with the Interior Build Out Contract, Ashmark sent Mr. Penington a proposal to increase the cost of the Interior Build Out Contract

from $1,827,622.95 to $2,796,277.00.  **Exhibit 10**.  This proposal prompted Mr. Penington to ask why Ashmark was requesting an additional $968,654.05 to perform the Interior Build Out Contract.  Mr. Penington had expected "minor changes" (**Exhibit 8**), but the added money being requested by Ashmark was hardly a "minor" cost increase.  **Exhibit 8**.  Moreover, Mr. Penington was unaware of changes that would have led to this drastic increase in costs.

      g.    Mr. Penington disapproved of Ashmark's request for an additional $968,654.05 and instead asked Ashmark to provide information sufficient to show why these increased costs were being requested.

      h.    On or around February 28, 2022, Ashmark submitted a proposed "Extra Work Authorization" to Mr. Penington, which sought an increased cost of $803,772.06, in connection with Bulletins 1 – 6 (a reduced request by Ashmark).  **Exhibit 11**.  However, Ashmark was still refusing to provide documentation to show that this amount was for a legitimate extra.  Thus, Mr. Penington was still unwilling to approve Ashmark's request for a drastically increased price.

      i.    Mr. Penington, with the help of his designer, Torey Flanary, continued to look to discover the true value of any extra costs being demanded by Ashmark by contacting the applicable subcontractors.  However, Ashmark told its subcontractors not to provide any information to Mr. Penington or Ms.

Flanary! The only subcontractor that would communicate with Mr. Penington, Display Group, revealed that Ashmark told it to mark up its bid! Display Group was asked to email Ashmark two (2) versions of a proposal, one "with" Ashmark's markup and one "without" Ashmark's markup. **Exhibit 12**. This evidence showed Mr. Penington that Ashmark was either taking kickbacks from subcontractors or attempting to hide the true cost of construction to justify its claimed $803,772.06 price increase.

  j. Ashmark never properly responded to Mr. Penington's requests for information, greatly delayed the project, and hid certain fees. Accordingly, Mr. Penington sent Ashmark an e-mail on March 20, 2022, indicating his intent to terminate Ashmark unless it could cure various breaches that Mr. Penington identified. **Exhibit 13**.

  k. Regretfully, Ashmark's response e-mail failed to address any of Mr. Penington's concerns adequately. **Exhibit 13**. For example, Ashmark's response demonstrated its continued refusal to share any subcontractor information with Mr. Penington, which was crucial for understanding the extra costs Ashmark claimed were necessary to continue with the Project.

  l. Mr. Penington promptly paid all amounts billed by Ashmark other than the disputed cost increase. He paid the initial bill from Ashmark, in connection with the Mezzanine Contract. **Exhibit 14**. Mr. Penington also

paid an invoice for the first 15% of the construction for the Interior Build Out Contract. **Exhibit 15**. Mr. Penington also paid the invoice from Ashmark for the second 50% of the Mezzanine Contract (**Exhibit 16**), which was only supposed to be sent when the mezzanine was 100% complete. **Exhibit 6**. Ashmark had billed Mr. Penington in full, in connection with the Mezzanine Contract, on January 25, 2022. **Exhibit 16**. However, Ashmark had <u>not</u> completed the mezzanine in January of 2022. On March 29, 2022, Mr. Penington, who was in Arizona, received an alert indicating that an alarm at the garage had been tripped. When Mr. Penington contacted Ashmark to see if it had been working in the garage, Ashmark revealed that it was still working on the mezzanine! **Exhibit 17**. Ashmark had lied to Mr. Penington about the mezzanine being fully complete and improperly billed him in full for that work. **Exhibit 16**. By this time, Mr. Penington had lost all faith in Ashmark, and Ashmark had failed to cure any of the defaults identified in Mr. Penington's March 20, 2021, e-mail. A notice of termination was sent to Ashmark on April 12, 2022. **Exhibit 18**.

  m. The April 12, 2022, termination notice indicated that Mr. Penington intended to pay Ashmark for costs incurred but also requested an accounting. **Exhibit 18**. Mr. Penington had no intent to pay Ashmark for work that it had not performed.

n. On April 18, 2022, Ashmark's counsel indicated that he had "requested that Ashmark put together an accounting to represent what was owed." **Exhibit 19**.

o. Ashmark never put together the promised accounting, so Mr. Penington hired Kasco, LLC to: (1) evaluate the value of Ashmark's work; and (2) complete the Project. Kasco determined that Ashmark was paid $504,759.45, completed only $282,022.99 worth of work, and therefore owed Mr. Penington $222,736.46. **Exhibit 20**.

p. On August 5, 2022, Mr. Penington's counsel wrote to Ashmark's counsel about the fact that Ashmark had been "significantly overpaid." **Exhibit 21**.

q. On September 29, 2022, Mr. Penington offered to resolve his dispute with Ashmark by accepting a reduced $200,000.00 amount. **Exhibit 22**. That same letter notes that if Ashmark was unwilling to pay the reduced amount, then "we intend to promptly file suit". **Exhibit 22**.

r. Ashmark was unwilling to repay any of the amounts that Mr. Penington was owed, which resulted in a lawsuit being filed on or around January 24, 2023. **Exhibit 23**.

s. In the year 2023, while Ashmark was involved in the Litigation, it claimed in its income tax return to have lost $197,245.00. See Ashmark's 2023. **Exhibit 24**.

t. Also in 2023, despite alleging to have lost $197,245.00 (**Exhibit 24**), Ashmark made $483,327.00 in distributions to its members! Martin Renel received $213,927.00 in distributions from Ashmark, while $134,700.00 was distributed to Ashley Israel and an additional $134,700.00 was paid to Marc Weinbaum. See the K-1s attached as **Exhibit 25**.

u. In 2024, Ashmark made an additional $106,620.00 in distributions to its members. This year, Martin Renel received $55,620.00 in distributions from Ashmark, while $25,500.00 was paid to Ashley Israel and an additional $25,500.00 to Marc Weinbaum. See the K-1s attached as **Exhibit 26**. This same year, Ashmark loaned an additional $112,288.00 to Mr. Renel. **Exhibit 27**.

v. Debtor could have easily repaid Mr. Penington the entire amount of his claim via the $702,235.00 in member distributions and member loans that it made, after Mr. Penington had filed suit against Ashmark. **Exhibits 23, 25, 26, and 27**.

w. The "overpayment" portion of Mr. Penington's claim, representing $222,736.46, is for trust funds under the Michigan Building

Contract Fund Act, MCL 570.151 *et seq.* ("MBCFA"), which were explicitly intended to pay for construction improvements. Those funds should not have been distributed to Ashmark's members through a series of disbursements and loans.

## Objection to the plan

3. Creditor rejects the plan. The plan should not be confirmed for the reasons stated below:

**(A)** **The Debtor's plan is not proposed in good faith and is proposed by means forbidden by law; and, therefore, the plan does not comply with 11 U.S.C. § 1129(a)(3).**

4. The Debtor's plan violates the MBCFA by failing to respect the trust imposed by that statute. The MBCFA provides that:

> In the building construction industry, the building contract fund paid by any person to a contractor, or by such by person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or material men, and the contractor or subcontractor shall be considered trustee of all funds so paid to him for building construction purposes.

See MCL § 570.151 et seq. The purpose of the MBCFA is to create a trust fund to protect owners, subcontractors, laborers, and material suppliers from financially irresponsible general contractors of private construction projects. See *Weathervane Window, Inc. v. White Lake Construction Co.*, 192 Mich App 316, 325; 480 NW2d 337 (1991). The MBCFA prevents money paid to a

contractor for a private project from becoming the contractor's property until all subcontractors, laborers, and material suppliers have been paid. This is because the contractor acts as a trustee with a fiduciary duty to these parties on the project. *People v. Whipple*, 202 Mich App 428, 432; 509 NW2d 837 (1993), *citing People v. Miller*, 78 Mich App 336, 340; 259 NW2d 877 (1997). In addition to the corporation being liable for a breach of fiduciary duty with respect to the trust fund, corporate agents, such as officers, are jointly liable for the corporation's breach of the MBCFA. *Au Bon Pain Corp. v. Artect, Inc.*, 659 F 2d 61, 65 (CA2 1981); see also *People v. Brown*, 239 Mich App 735; 610 NW2d 234 (2000). The MBCFA imposes criminal penalties for a contractor who breaches this fiduciary duty. MCL § 570.152.

5. In the Litigation, it was established that Ashmark was overpaid via advanced payments from Mr. Penington for construction work. **Exhibit 1**. Thus, Ashmark's failure to repay the construction funds it was paid in advance is a clear violation of the MBCFA. Under the rule articulated in *Au Bon Pain Corp. v. Artect, Inc.*, Ashmark's violation of the MBCFA is also imputed to its principlals, employees and/or officers.

6. Creditor is entitled to a full refund of the building contract fund paid by him, because such payment was legally required to be held in trust by the Debtor. See MCL § 570.151 et seq. The Debtor has not addressed this

issue. Moreover, the Debtor is clearly aware of this issue, since its plan discusses that other parties have rights under the MBCFA. Interestingly, none of those parties was listed as a creditor in this bankruptcy. Thus, it appears that the Debtor's plan is negatively treating Mr. Penington, the only creditor listed in this case who holds a judgment against Ashmark!

7. Ashmark's disparate and unfavorable treatment of Mr. Penington is one of the primary issues related to the plan, especially since the Debtor claims that the Creditor is one of only two creditors.

8. It is also worth noting that the Debtor has failed to explain why the Creditor would not be entitled to a full refund of the building contract fund paid by him and held in trust by the Debtor. The Debtor should provide an accounting of its use of the $222,736.46 in trust funds received from Mr. Penington, which the state court has already determined was not used as part of the underlying construction project.

9. Ashmark presumably did not attempt to show what it did with Mr. Peninton's trust fund payment, because the evidence indicates that Ashmark took these funds and conveyed them to its members as improper distributions and loans. See **Exhibits 25, 26, and 27**.

10. The evidence shows that Ashmark was a profitable company. Ashmark's 2024 tax return shows $367,046.00 in ordinary income. **Exhibit**

27. The primary reason Ashmark filed bankruptcy was to prevent Mr. Penington from recovering the unlawful distributions made to Ashmark's owners. In 2023, Ashmark's member distributions totaled $483,327.00. **Exhibit 25**. In 2024, Ashmark paid an additional $106,620.00 to its members (**Exhibit 26**) and made an additional member loan of $112,288.00 (**Exhibit 27**). Thus, Ashmark improperly conveyed at least $702,235.00 to its members in 2023 and 2024 and now claims an inability to pay Mr. Penington and M1 Concourse, LLC. Interestingly, the $702,235.00 amount is MORE than the full, combined value of both Mr. Penington's claim ($349,975.26) and M1 Concourse, LLC's unliquidated claim of $283,593.93[1]. Mr. Penington does not believe that M1's claim should be allowed.

11. Debtor's plan lists certain "Insider Transactions", which were payments to the Debtor's members. However, this portion of the plan only listed $100,000 in profit distributions and a $79,719.63 salary for Mr. Renel between July 1, 2024 and June 30, 2025. The tax returns of Ashmark show that actual distributions were $106,620 ($55,260 to Mr. Renel, $25,500 to Israel, and $25,500 to Weinbaum), plus an additional $112,288 loan (which was made to Mr. Renel). **Exhibit 27**. Thus, the 2024 Insider Transactions were significantly higher than what is listed in the plan. Furthermore, while

---

[1] $349,975.26 + $283,593.93 = $633,569.19. This amount is less than the $702,235.00 that Ashmark paid out via its 2023 and 2024 membership distributions and loans.

the plan alleges, without support, that Ashmark's "Profit Distributions did not render Ashmark insolvent", the plan fails to account for Ashmark's 2023 member distributions totaling $483,327.00. **Exhibit 25**. As noted above, the collective 2023 and 2024 membership disbursements total more than $700,000. If Ashmark had not distributed its working capital to its members, Ashmark would have had the means to pay its creditors and still maintain operations.

12. For these reasons and for the other reasons explained in this objection, the plan also discriminates unfairly against Creditor, under 11 U.S.C. § 1191(b), and is not fair and equitable.

**(B)** **The Debtor's plan does not meet the "best interests of creditors" requirement of 11 U.S.C. § 1129(a)(7) by providing that Creditor will receive not less than he would receive were the Debtor liquidated under chapter 7 on the effective date of the plan.**

13. The plan fails to show that the Creditor will receive not less than he would receive were the Debtor liquidated under Chapter 7 on the effective date of the plan. Reasons for this failure include the following:

a. The Debtor's "Avoidance Claims", as described in its liquidation analysis, are grossly understated. From 2021 through 2024, the Debtor made distributions to its members totaling $1,648,374 according to its federal income-tax returns. In particular, member distributions were $494,338 in 2021; $564,089 in 2022; $483,327 in 2023, and $106,620 in 2024. See

**Exhibits 25 and 26**. The plan is an instrument of deception, falsely claiming that these distributions are not recoverable because the Debtor was not insolvent. However, if Ashmark is not insolvent, the Creditor must be repaid in full, with interest. Further, the distributions were made after Mr. Penington's written demands for an accounting/repayment of the trust fund "overpayment" made for construction work that Ashmark never performed. **Exhibits 18 – 22**. Worse, Debtor made member distributions totaling $483,327.00 in 2023 alone, after Creditor had filed a Complaint against Ashmark and in a year when Debtor claimed to have experienced a yearly loss of $197,245.00. **Exhibits 23, 24, and 25**. This is evidence of transfers made with the intention of defrauding the Creditor.

      b.    The Debtor has failed to disclose that its member distributions, given their temporal proximity to payments made by the Creditor, were made with trust funds under the MBCFA. The Debtor has also failed to account for the value of avoiding those additional transfers.

      c.    Offsets claimed in the liquidation analysis for "Lien(s) or Interest(s)" are not adequately explained. The Debtor argues that there exists some $891,812.09 in "liens pursuant to the Michigan Builders Trust Fund Act claims", presumably meaning claims by creditors that paid funds now held by the Debtor subject to the MBCFA. Yet, the Debtor did not list any such creditor

16

25-46693-tjt    Doc 60    Filed 10/23/25    Entered 10/23/25 14:05:42    Page 16 of 20

in its schedules. Moreover, Creditor *is* a creditor whose funds are held by the Debtor subject to the MBCFA. The plan implies that creditors other than Creditor are to be paid in full, while leaving the Creditor to be paid less. Thus, the plan unfairly discriminates against Creditor in violation of 11 U.S.C. § 1191(b)[2].

    d. Other assumptions in the Debtor's liquidation analysis are false or unreasonable. The estimate of attorney fees for the Debtor's attorneys for $75,000 is excessive for a case that, thus far, has been relatively quiet. The estimate of $124,519.45 for Chapter 7 administrative expenses is likewise excessive. These figures illustrate the Debtor's bad faith. Instead of offering a payment plan to its only legitimate creditor, the Debtor set in motion a process that it claims will consume nearly the same amount as the "overpayment".

    e. There is no basis for discounting the value of the "officer receivable". Mr. Renel, who owes the Debtor $79,000 according to amended schedule A/B (Doc. # 30) for repayment of a loan, also received distributions from 2021 through 2024 totaling $767,554, an annual salary of approximately

---

[2] It is also worth noting that Debtor's plan primarily seeks to avoid payment to just Mr. Penington and M1 Concourse, LLC. Mr. Penington already prevailed against Ashmark at trial. **Exhibit 1**. However, Ashmark appears to contest M1 Concourse, LLC's claim, based upon a Master Subcontract Agreement that may have expired on December 31, 2018. **Exhibit 28**. Thus, it seems that Ashmark's entire bankruptcy, and its Insider Transactions, have all been done in an effort to avoid repaying Mr. Penington.

$80,000.00, and the use of an Alfa-Romeo automobile. The plan favors Ashmark's members at the expense of the Creditor.

  f. Debtor's plan also calls for a roughly $38,000.00 increase in Mr. Renel's yearly salary, to $118,000.00, plus continued use of an Alfa-Romeo! This is another example of the Debtor prioritizing its owners over its creditors. Mr. Renel's liability to the Debtor for loan repayment and unlawful distributions, and a rejection of a $38,000 yearly raise for Mr. Renel, would collectively allow the Creditor to be paid in full. Thus, Liquidation by a trustee will be a better alternative if the Debtor does not find the means to pay its creditors promptly.

  g. The Debtor fails to account in its financial projections for the income of the parallel business, Ashmark Construction Contractors, LLC, a Florida limited liability company, for which the Debtor is paying at least some expenses. This similarly named entity uses the same office as the Debtor (5640 W. Maple Rd., Ste. 300, West Bloomfield, Michigan), uses the same phone number (248-855-1575), uses the same website (http://ashmark.com), and has similar members (Martin Renel, Ashley Israel, and Marc Weinbaum). During the creditor's examination, Debtor (Ashmark Construction, LLC) acknowledged that it was sharing in the payment of Ashmark Construction Contractors, LLC's expenses, which means that there may be co-mingling of

assets, fraudulent conveyances, or additional income of the Debtor that is unaccounted for by the Debtor. The Debtor's calculation of its disposable income is therefore understated[3].

**(C) The Debtor Must Produce Additional Information Requested by Creditor.**

14. Creditor has demanded further documentation from Debtor to enable Creditor to trace the funds held in trust by the Debtor for him. The Creditor requested income statements, balance sheets, and cash flow records that are readily available, but the Debtor has not yet supplied sufficient documentation. Confirmation should not be granted while the Debtor has failed to produce the relevant information and is concealing evidence of its criminal violation of the MBCFA.

15. Ashmark filed for bankruptcy not because of its inability to operate according to its business plan, but because its members distributed almost all of the Debtor's cash in an effort to avoid payment to Mr. Penington. For this reason and for all of the reasons set forth herein, confirmation of the Debtor's Plan should be denied, and additional relief should be ordered.

---

[3] It is also interesting to note that while Ashmark's plan seeks to raise Mr. Renel's salary by roughly 50%, he is now only working part time for Ashmark while also devoting time to another "Ashmark" entity – if it is truly a separate entity.

**WHEREFORE**, Richard Penington, Creditor, respectfully requests that the Court deny confirmation of the plan and order the Debtor to account for funds paid by Creditor and referred to as the "overpayment".

        **MORRIS & MORRIS ATTORNEYS, P.L.L.C.**

        By: /s/ *Thomas R. Morris*
            Thomas R. Morris (P39141)
        Attorneys for Creditor
        3258 Broad Street, Suite 1
        Dexter, MI 48130
        (734) 221-0077   Fax: (734) 396-8172
        tmorris@morrispllc.com