STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

**RICHARD A. PENINGTON**, an individual,

     Plaintiff,

-v-

Case Number: **2023-198433-CZ**
Honorable Nanci J. Grant

**ASHMARK CONSTRUCTION, LLC**,
a Michigan limited liability company, and
**MARTIN RENEL**, an individual,

     Defendants,

and

**ASHMARK CONSTRUCTION, LLC**,
a Michigan limited liability company,

     Counter-Defendant and Third-Party Plaintiff,

-v-

**LEE INDUSTRIAL CONTRACTING, INC**,
a Michigan corporation,

     Counter-Plaintiff and Third-Party Defendant,

_____ /

### OPINION AND ORDER

At a session of said Court, held in the
Courthouse in the City of Pontiac, County of
Oakland, State of Michigan on the 13th day of
June, 2025,

PRESENT:   HONORABLE NANCI J. GRANT, CIRCUIT JUDGE

    This matter was before the Court for Bench Trial. Trial began on September 24, 2024 and concluded on December 16, 2024. The Parties submitted their Proposed Findings of Fact and Conclusions of Law. The Court, having reviewed the testimony and the Parties' Proposed Findings of Fact and Conclusions of Law finds Defendant Ashmark Construction, LLC in breach of the Contracts at issue in this litigation, finding Plaintiff Richard Penington sustained damages as a result of Defendant's breach in the amount of $246,258.06 plus continuing interest. The reasoning for the Court's ruling is outlined below.

EXHIBIT

1

**Procedural History**

Plaintiff Richard Penington (herein "Penington") filed this Complaint on January 24, 2023 against Defendant Ashmark Construction, LLC (herein "Ashmark") and Martin Renel (herein "Renel"), Ashmark's principal. The Complaint alleged the following counts: 1) breach of contract by Ashmark; 2) violation of the Michigan Building Contract Fund Act by Ashmark and Renel; 3) fraudulent misrepresentation by Renel; and 4) common law and statutory conversion by both Ashmark and Renel.

On February 7, 2023, Ashmark filed a Third Party Complaint against Lee Industrial Contracting, Inc. (herein "Lee"). On April 7, 2023, Lee filed a Counter-Complaint against Ashmark. The Court notes that the claims between Ashmark and Lee have been resolved pursuant to the Court's October 24, 2024 Order & Opinion granting Lee's Motion to Dismiss the Third-Party Complaint, and further by the Parties' December 12, 2024 Stipulated Order to dismiss the Third-Party Counter-Complaint. Lee is no longer a party to this case.

On June 7, 2023, the Court issued an Order & Opinion granting Ashmark and Renel's Motion for Partial Summary Disposition, dismissing Penington's fraudulent misrepresentation and conversion claims. On October 31, 2023, the Court issued an Order & Opinion granting Ashmark and Renel's second Motion for Summary Disposition in part and denying it in part. The Court's October 31, 2023 Order dismissed Penington's claim under the Building Contract Fund Act, which was the only remaining claim against Renel individually.

This matter proceeded to a bench trial on Penington's only remaining claim, the breach of contract claim against the corporate defendant, Ashmark.

**Factual Overview**

On or around January 1, 2020, Penington hired non-party Studio Detroit, LLC (herein "Studio Detroit"), an architectural firm, to design a high-end interior space located at the M1 Concourse (herein the "Concourse"), specifically Unit 197 (referenced herein as the "Project"). The Project would ultimately serve as a multipurpose space—to store vehicles and host events.

In February of 2020, Studio Detroit prepared schematic floor plan sketches in connection with the Project, which included a set of stairs going up from the ground floor to the first level of a mezzanine, and a second set of stairs going from the first to the second level of the mezzanine.

2

Studio Detroit suggested Penington hire Ashmark as the general contractor for the Project. During trial, it was revealed that Studio Detroit and Ashmark often referred one another to projects within the Concourse.

On September 14, 2021, Plaintiff signed Defendant's proposal to construct the Project's mezzanine for $219,276.00. This included two sets of stairs, described above. On September 23, 2021, Plaintiff and Defendant entered into a Service Contract for the steel mezzanine construction. This Service Contract will herein be referred to as the "Mezzanine Contract."

The Mezzanine Contract provided that Plaintiff was to pay a lump sum of $219,276.00 and referenced the signed September 14, 2021 proposal. The proposal included, among other things, "Structural Steel mezzanine with (2) sets of stairs." The Mezzanine Contract required Defendant to complete its work "approximately 2 weeks after Construction start."

The Court notes that the Mezzanine Contract indicated, in Paragraph 3 under subheading "Special Conditions," the following:

> All terms and conditions on Exhibit A shall apply. This contract does not cover or address property conditions not specifically covered in the plans and specifications, which may result in additional charges to Owner.

On November 19, 2021, Ashmark's representative and former defendant, Renel, provided Penington with "preliminary pricing" for the interior build-out of the Project space. The "preliminary pricing" sheet outlined a preliminary budget for the interior work.

Critical to this litigation was an email sent from Renel to Penington on November 24, 2021, wherein Renel indicated, "Since Kevin's team is still modifying the final plans, we know that there will be minor changes to finishes, design, etc. that will affect costs and final selections."

Between November 24, 2021 and November 29, 2021, the Parties signed a second "Service Contract" for the Interior Build Out. Again, this was a separate agreement from the Mezzanine Contract and will be referred to herein as the "Interior Build Out Contract." The Interior Build Out Contract was based on a preliminary budget of $1,827,622.95, which Ashmark was to bill "based on percentage of completion." The Interior Build Out Contract indicated Ashmark would be paid a 9% fee on top of the construction costs. During trial, Peninton testified "time was of the essence," because he wanted the Project to be complete for the 2022 racing season.

In January of 2022 Ashmark sent Penington a proposal to increase the cost of the Interior Build Out Contract from $1,827,622.95 to $2,796,277.00, amounting to an increase total of $968,654.05. Penington did not approve this increase and asked Ashmark, through Renel, to

provide supplemental supporting documentation, including an itemized breakdown of the cost increase. Penington's designer, Torey Flanary (herein "Flanary") also requested information from Ashmark/Renel via oral and written requests.

In response to these requests for information, Renel provided summaries of alleged increased costs but did not provide supporting documents showing how Ashmark arrived at the increased cost amounts. After some back and forth discussions, on February 18, 2022, Ashmark lowered the price but still claimed the Interior Build Out Contract would cost an additional $803,776.06 over the original preliminary pricing contained in the Interior Build Out Contract.

Flanary, after failing to obtain the supplemental information to support the increased cost from Renel, reached out to subcontractors directly. The only subcontractor that would communicate with Flanary was non-party Display Group. In their communications, Display Group informed Penington and Flanary that Ashmark instructed it to mark up its bid by approximately 10%. During trial, Penington introduced Exhibits 36 and 37, which were emails Display Group sent to Renel offering two prices—one price with the 10% markup, and one without. It is Penington's position that Ashmark tried to "hide" this markup in the proposed cost increase, which is why Renel would not provide supporting documentation to explain the increase.

On March 20, 2022, Penington sent Renel an e-mail indicating his intent to terminate Ashmark from the Project. Both the Mezzanine Contract and the Interior Build Out Contract require the intent of termination to be in writing.

The March 20, 2022 email to Renel indicated the following: "At this time, I have lost confidence in Ashmark to complete the construction of Unit 197."

Renel responded in writing with his explanation for the increased costs and delays. Specifically, Renel indicated there were unforeseen issues with the foundation including "underground conduits" which caused a start delay of "over 6 weeks."

Renel's response to the email also mentioned materials scarcity and that a "delay in approvals of previously submitted pricing is stopping us from going forward." The email also asked Penington to "respect my business relationships with my subcontractors" and indicated Penington should refrain from directly contacting the subcontractors and instead direct all communication to Renel. Renel ended his response by stating the following, "Please confirm in writing that you are satisfied with this response and that we are moving forward with this project."

On April 12, 2022, Penington, through his attorney, sent Ashmark a termination letter which stated as follows:

4

Mr. Penington has expressed deep dissatisfaction with recent developments on the Project. This dissatisfaction comes from your refusal to provide him with the basis, and in many instances the actual quotes from subcontractors and suppliers regarding changed work and your attempt to mark-up subcontractor and supplier quotes far beyond industry norm. In addition to your General Contractor fees, Mr. Penington has discovered your total mark-ups approach twenty-six (26%).

Both the Mezzanine Contract and the Interior Build Out Contract provided Ashmark could be terminated after five days' notice "in the event of default" by Ashmark. See Penington's Exhibits 11 and 15 at Section 16; see also Penington's Exhibit 34, Section 16.

Following its termination, Ashmark provided a Sworn Statement dated August 26, 2022, signed by Renel. This was admitted as Penington's Exhibit 51. The Sworn Statement reads as follows:

> That the following is a statement of each subcontractor and supplier and laborer, for which laborer the payment of wages and fringe benefits and withholdings is due but unpaid, with whom the (contractor)(subcontracted) for performance under the contract with the owner of lessee thereof, and that the amounts due to the persons as of the date hereof are correctly and fully set forth opposite their names, as follows:

The Sworn Statement purports to show a list of work performed by Ashmark, the amount already paid by Penington, the amount owing for work actually performed, and the balance due for each line item. The sworn statement shows the following totals: $504,759.45 paid by Penington, $42,422.17 allegedly owed by Penington for work already performed, and $1,510.97 due, representing the total outstanding amount had Penington continued with Ashmark until completion of the Project.

Following Ashmark's termination, Penington hired Kasco, Inc. (herein "Kasco") to replace Ashmark as general contractor. During trial, the Court granted Penington's Motion to swear Kasco's Executive Vice President, Mark Engle (herein "Engle"), as an expert witness in the area of construction management and construction cost estimation.

Engle testified as a fact witness as to what had been done on the project after Ashmark's termination, and as an expert in construction cost estimation. Engle prepared a document showing the value of the work needing to be done, the percentage which was completed, and the estimated value of the work that was completed. This document, admitted as Penington's Exhibit 47, was based on Engle's expertise as well as his physical inspection of the Project.

Engle testified he determined the "percentage complete" through inspection and breaking down each item of work into "components" to determine the percentage of work that was actually

5

performed. Engle arrived at the "estimated value completed" by subtracting the total amount done by Ashmark from the value of the numbers in Ashmark's Sworn Statement. Based on his inspection and expertise, Engle concluded that Ashmark completed an estimated $282,022.99 in work on the project.

Engle also determined the amount paid by Penington in advance of the work being performed. This estimate was included on Exhibit 47 under the heading, "payment prior to work completed." Engle concluded, based on the numbers in the sworn statement and the percentage of work completed, that Penington paid $222,736.66 for work that was not completed.

According to Engle's testimony, work that was already done by Ashmark either needed to be corrected or additional work needed to be done to satisfactorily complete the Project. Engle determined some of the walls were not even, there were issues with millwork, and that there were alleged structural issues with the mezzanine. The Court notes that Lee's Motion to dismiss Ashmark's Third-Party Complaint was granted, finding there was no evidence presented to support defective work. Engle's testimony merely indicates that the mezzanine was not "sound" after an inspection by a structural engineer. Engle's testimony as to what specific defects caused the mezzanine to be "unsound" was not detailed and Engle was not qualified as an expert to testify as to the structural defects of the mezzanine.

The Court notes that Ashmark did not present an expert witness to dispute nor rebut the values calculated by Engle.

### Ashmark's Alleged Breaches

Penington alleges Ashmark breached both Contracts in the following ways: 1) failing to "promptly submit" certificates of insurance to Penington; 2) failing to name Penington as an additional insured on the applicable insurance; 3) never submitting any insurance certificates to Penington until after this litigation began; 4) billing Penington for the full amount of the Mezzanine Contract before the mezzanine was completed; 5) increasing the cost of both the Mezzanine and the Interior Build Out Contracts without beginning any of the work; 6) failing to provide supporting information, including itemization, for the increased costs; and 7) charging a hidden 10% "kick-back" fee in addition to a 9% contractor fee, to cover the cost of doing business at the Concourse.

### 1. Certificates of Insurance

As stated above, Penington argues Ashmark breached the Contracts by failing to "promptly submit" certificates of insurance to Penington and failing to name him as an additional insured. Section 12 of the Contracts' Terms and Conditions required "all policies evidence such insurance shall name Owner as additional insured." See Exhibits 11 and 15, Section 12; see also Exhibit 24, Section 12. While Ashmark did provide an insurance certificate, it did not name Penington as an additional insured as required by Section 12 of the Contracts.

The Court agrees with Penington that Ashmark is in breach for failing to comply with Section 12 of both the Interior Build Out and Mezzanine Contracts. There was no testimony at trial to rebut Penington's claims related to the certificates of insurance. Under Michigan law, non-performance of an obligation due is a breach of contract even though the liability of the nonperforming party is limited or nonexistent." *Woody v Tamer*, 158 Mich App 764, 773 (1987).

### 2. Mezzanine Contract

Penington alleges Ashmark breached the Mezzanine Contract by: 1) failing to begin the work as mandated by the Mezzanine Contract and 2) by improperly billing Plaintiff for completion of the mezzanine before it was complete.

Section 5 of the Terms & Conditions, attached to the Mezzanine Contract, provided for a "time is of the essence" clause. Defendant did not obtain permits for the Mezzanine work until December 17, 2021. Penington testified that on the same day, December 17, 2021, he was made aware of underground conduits which would pose a potential problem in constructing the mezzanine. Specifically, that the weight of the mezzanine structure would be too heavy and could "squish" the underground conduits.

On December 23, 2021, Renel emailed Penington and told him the conduit issue required a re-design of the structural steel foundation for the mezzanine. Renel attached an "Extra Work Authorization" (herein "EWA")[1] totaling $10,655.00 due to having to re-design the mezzanine to accommodate the conduits. Penington signed the work authorization on December 24, 2021. Penington testified this was the only EWA he ever approved during the time Ashmark was working as the general contractor because he understood it and it was fully explained to him.

---

[1] The Parties refer to what are commonly known as "change orders" as "extra work authorizations" or "EWA." The Parties also use the phrase "Bulletins" to describe change orders coming from Non-Party Studio Detroit.

The Mezzanine Contract provided for a "Progress Payment Schedule" of "50% down at execution of Contract; 50% upon completion." Penington alleges Ashmark breached the Mezzanine Contract by requesting full payment prior to completing the work. Specifically, on January 25, 2022, Penington received an invoice for another payment on the Mezzanine Contract. The January 25, 2022 invoice included the remainder of the price of the mezzanine as well as the $10,655.00 to remove the conduit, totaling $120,643.00.

As indicated above, the Mezzanine Contract required a 50% down payment and the remainder to be paid *on completion*. Upon receipt of a second request for payment on the Mezzanine Contract, Penington testified he "assumed" the mezzanine was completed and that was why he was receiving the invoice for the final payment. Penington testified he was in Arizona at the time of receiving the second invoice, and he paid it within two days via wire transfer.

On March 29, 2022, Penington received an alert from the M1 concourse that someone was inside the garage. Penington immediately contacted Renel, who emailed him and stated the following: "Yes, we were bringing in and installing the angle iron on mezzanine. It is very cold here today; the door is now shut and should not be an issue."

Penington testified he had paid the full balance of the mezzanine back on January 25, 2022. Penington testified he assumed the mezzanine had been completed because he had paid in full, and the Mezzanine Contract indicated the second payment was to be "due on completion." On May 21, 2022, Penington returned to the garage and the mezzanine was not complete despite that he had paid in full on the Mezzanine Contract.

A party asserting a breach of contract must establish by a preponderance of the evidence that: 1) there was a contract; 2) which the other party breached; 3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 151, 178 (2014). When contractual language is unambiguous, courts must interpret and enforce the language as written because an unambiguous contract reflects, as a matter of law, the parties' intent. *Harper Woods Retirees Ass'n v City of Harper Woods*, 312 Mich App 500 (2015).

Section 3 of the Mezzanine Contract states as follows, in plain language:

> In consideration for the performance of the Work or Services, Owner will pay to Contractor the following sums of money (the "Contract Price") as shown below or in an attached payment schedule.
> **Contract Price**:      $219,976.00

**Progress Payment Schedule:**

> 50% down at Execution of Contract; 50% upon Completion.
> Payments to be made within (10) days of submission to Owner.

The Court finds the language of the Mezzanine Contract to be unambiguous. The second payment for the remaining balance on the Mezzanine Contract was not due until the work was *completed*. The evidence at trial demonstrated that the mezzanine was not complete on January 25, 2022 when Penington paid the remaining balance and the $10,655.00 for the approved EWA. Photographs of the Project, Plaintiff's Exhibit 42, demonstrated that Ashmark had not completed the mezzanine's second set of stairs as of April 1, 2022, over two months after Penington wired the final payment.

The Court finds Ashmark is in breach of Section 3 the Mezzanine Contract by accepting full payment prior to the work being completed.

**3.      Interior Build Out Contract**

Penington alleges Ashmark breached the Interior Build Out Contract by failing to adequately inform him about pricing changes and charging him to cover a 10% "kick-back" that Ashmark owed the Concourse for its referrals. Plaintiff's Exhibit 15 contains the Contract for the Interior Build Out. The "Scope of Work" indicated the following: "M1 Garage Unit 197 Construction of Interior Build Out as per ASHMARK Construction proposal dated 11/19/2021." The Interior Built Out indicated that the "preliminary pricing" was based on pricing from Studio Detroit dated October 1, 2021. The Interior Build Out indicated the "completion date" was based on the "attached preliminary schedule—unless project is delayed by reasons beyond the control of the contractor."

The total price was $1,827,522.95 with a progress payment schedule of 15% down at execution of the contract and monthly billings based on "percentage of completion." Like the Mezzanine Contract, the Interior Build Out contained a subheading titled, "Special Conditions," which stated the following:

> All terms and conditions on Exhibit A shall apply. This contract does not cover or address property conditions not specifically covered in the plans and specifications, which may result in additional charges to Owner.

Penington testified he executed the Interior Build Out and paid the down payment of $274,128.45 on November 29, 2021. Penington testified that it was his impression the down payment was refundable because the billing was to be done "as work was completed."

Penington received another EWA on January 19, 2022. Penington's admitted Exhibit 22 is an email from Renel explaining the January 2022 EWA and/or change order was done to "encompass[] the plan revisions as issued by Studio Detroit thru 1.6.22." The January 2022 EWA included a significant price increase, raising the cost from approximately $1.8 million to $2.8 million. The cost increases were "summarized" in the email. However, the "summary" of the increases was not detailed.

Penington testified he was "surprised" by this significant increase because he was under the impression this was a "fixed bid" contract and only subject to "minor" price adjustments. According to Penington's testimony, no one approached him indicating there were any serious issues with the original bid and he felt "blindsided" by the cost increase. Penington testified he "never approved" the additional cost on the Interior Build Out. Penington also indicated, and the Court notes, that the January 2022 EWA revised pricing did not include the word "preliminary" as the original November 2021 pricing had indicated.

After receiving the request for the increased pricing, Penington requested more information to explain the price increase by emailing Renel and by asking him verbally. Penington also asked his interior designer, Tory Flanary, to review the invoices and investigate why the project cost was increasing.

Penington read into the record Section 24 of the Terms and Conditions, which was incorporated in both the Mezzanine and Interior Build Out Contracts. Section 24 states:

> Any proposed changes in the Scope of Work or Plans and Specifications proposed materials substitutions or omissions affecting this Contract must be submitted by Contractor (Ashmark) to Owner (Penington) in the form of a Change Order describing such changes, substitutions or omissions. No such change, substitution or omission shall be commenced, initiated or undertaken prior to written approval of the Change Order thereof by Owner.

During trial, Renel testified that most of the cost increases were coming from non-party Studio Detroit. Specifically, on December 21, 2021, the structural engineer revised the foundation plan and Studio Detroit issued Bulletin #4 with changes to the audiovisual component and lighting fixtures, which, according to Renel and Ashmark, caused substantial cost to the project. For example, the original electric power distribution, lighting fixtures, and the audio-visual allowance was $280,000 in the original Interior Built Out. See Ashmark's Exhibit U. According to Renel's

10

testimony, due to the changes directed by Studio Detroit, the price grew to $761,756.00 as of January 19, 2022. See Ashmark's Exhibit U-2. The audiovisual allowance grew from $66,960.00 on November 19, 2021 to $371,804.00 as of January 19, 2022 due to Studio Detroit's revisions. See Ashmark's Exhibit U; see also Ashmark's Exhibit U-2.

Renel also testified that he had made a bid on a "feature wall" which was to be built of carbon fiber and was to be a "significant" detail of the Interior Build Out. Penington testified that he chose to work with a Spanish company for the "feature wall" and use a designer he had worked with in the past, Pedro Sanchez. During trial, Renel testified if Penington had gone with Ashmark's bid on the "feature wall," he would have saved additional monies. The Court notes the "feature wall" was never included in the original price of the Interior Build Out Contract.

Renel testified he reached out to Penington after the January 19, 2022 EWA and was informed by Penington that the cost was "now significantly above my budget." According to Renel, prior to this date he had been unaware that Penington had a budget for the Project.

While the Court is cognizant that the changes to the Project appeared to be coming from non-party Studio Detroit, both Flanary and Penington's testimony indicated they requested detailed information and line-item explanations as to the cost increases. There is no evidence in the record showing Ashmark complied with Penington's request, as required by Section 24.

A party asserting a breach of contract must establish by a preponderance of the evidence that: 1) there was a contract; 2) which the other party breached; 3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co*, supra at 178. When contractual language is unambiguous, courts must interpret and enforce the language as written because an unambiguous contract reflects, as a matter of law, the parties' intent. *Harper Woods Retirees Ass'n*, supra.

The evidence at trial demonstrates Ashmark failed to provide Penington with the details he requested regarding the price increases. As cited above, Section 24 of the Terms & Conditions attached to the Interior Build Out Contract states as follows, in relevant part: "Any proposed changes in the Scope of Work or Plans and Specifications proposed materials substitutions or omissions affecting this Contract must be submitted by Contractor (Ashmark) to Owner (Penington) in the form of a Change Order *describing such changes, substitutions or omissions*." (emphasis added).

The Court finds Ashmark breached the Interior Build Out Contract by failing to comply with Section 24, above.

### 4. The M1 Developer Fee

At issue during trial was an alleged "kick-back fee" that Penington claims Ashmark attempted to hide within the cost increases. Ashmark's Sworn Statement alleges it performed $33,840.00 worth of "Utility Scanning/Mapping/Cutting Removals." According to Penington, this $33,840.00 line item was included to hide the "kick-back fee." There were no records produced nor was there any evidence at trial to support this work. Whether the $33,840.00 for "Utility Scanning/Mapping/Cutting Removals" included some sort of "developer fee" to the Concourse is irrelevant to the Court's determination of Ashmark's breach. What is relevant to Penington's breach of contract claim is whether Ashmark complied with all terms of the Contracts.

The Court already found Ashmark to be in breach of Section 3 of the Mezzanine Contract for accepting final payment when the mezzanine was not completed as well as Section 24 of both Contracts due to its repeated refusal to give Penington a detailed invoice and explanation for the price increases.

### 5. Damages

The Court finds Ashmark breached the Mezzanine and Interior Build Out Contracts for the reasons outlined above. Penington seeks the following damages: 1) the overpayment of $222,736.46 identified by Engle; 2) interest on the overpayment in the amount of $23,521.60; 3) damages for defects and structural issues in the amount of $128,771.40; 4) interest on the structural damages and defects in the amount of $13,589.39; 5) $33,269.75 overpayment for the "kick-back fee"; and 6) interest in the amount of $3,513.32 on the "kick-back fee," totaling $425,410.53.

The Court finds no evidence was presented as to any structural defects. Engle was not sworn as an expert with respect to how and why the structural steel mezzanine was defective.

The Court finds Penington did not provide any support for the overpayment of $33,269.75 with respect to the alleged "kick-back fee." Although the Court finds Ashmark in breach for failing to provide the necessary details to support the price increases, Engle's Report—the only admitted measure of damages in this case—includes only the overpayment of $222,736.46.

The damages from Ashmark's various breaches, including the breach of Section 3 of the Mezzanine Contract and Section 24 of the Terms & Conditions, amount to Penington's overpayment for work that was not performed, plus interest. Ashmark did not present any expert to rebut Engle's testimony as to this overpayment.

12

The Court awards the following damages: $222,736.46 in overpayment as identified by Engle on Penington's Exhibit 47, and $23,521.60 in interest on the overpayment, for a total award of $246,258.06 plus continuing interest at the statutory judgment interest rate.

This is a final Order and closes the case.

IT IS SO ORDERED.

_Nanci J. Grant_

NANCI J. GRANT, Circuit Court Judge

SA

13

**Fill in this information to identify the case:**

Debtor 1    Ashmark Construction, LLC

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Eastern District of Michigan

Case number   25-46693-tjt

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

## Part 1: Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Richard A. Penington<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Richard A. Penington<br>Name | Morris & Morris Attorneys, P.L.L.C.<br>Name |
| 31207 Foxboro Way<br>Number    Street | 3258 Broad Street, Suite 1<br>Number    Street |
| Beverly Hills, MI     48025<br>City    State    ZIP Code | Dexter, MI     48130<br>City    State    ZIP Code |
| Contact phone 248-240-1047 | Contact phone 734-221-0077 |
| Contact email richard.a.penington@gmail.com | Contact email tmorris@morrispllc.com |

Uniform claim identifier (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____<br>                                           MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 349,975.26

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

money judgment relating to breach of services contract

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).          $_____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).          $_____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).          $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).          $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).          $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.          $_____

\* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

---

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/06/2025
                  MM / DD / YYYY

/s/ Thomas R. Morris
_____
Signature

Print the name of the person who is completing and signing this claim:

Name         Thomas R. Morris
             First name        Middle name        Last name

Title        attorney for creditor

Company      Morris & Morris Attorneys, P.L.L.C.
             Identify the corporate servicer as the company if the authorized agent is a servicer.

Address      3258 Broad Street, Suite 1
             Number        Street
             Dexter, MI 48130
             City                    State        ZIP Code

Contact phone  734-221-0077          Email  tmorris@morrispllc.com

<u>Attachment to proof of claim of Richard A. Penington</u>.


Creditor's claim is based upon the attached opinion and order awarding him damages of $246,258.06. The Debtor filed for bankruptcy prior to entry of a judgment and prior to Creditor requesting an award of its legal fees, incurred from October 24, 2023 through June 6, 2025, in the amount of $103,717.20.

The total amount claimed is $349,975.26.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

**RICHARD A. PENINGTON**,
an individual,

        Plaintiff,

vs.

**ASHMARK CONSTRUCTION, LLC**
a Michigan limited liability company, and
**MARTIN RENEL**, an individual,

        Defendants,

and

**ASHMARK CONSTRUCTION, LLC,**
a Michigan limited liability company,

        Third-Party Plaintiff,

vs.

**LEE INDUSTRIAL CONTRACTING, INC.,**
a Michigan corporation,

        Third-Party Defendant.

Case No.: 2022-198433-CZ
Hon. Nanci J. Grant

_____/

Ronald A. Deneweth (P27680)
Alexander Choi (P84544)
DENEWETH, VITTIGLIO & SASSAK, PC
Attorneys for **Richard A. Penington**
1175 W. Long Lake Rd., Suite 202
Troy, MI 48098
(248) 290-0401/08 / (248) 290-0415 (fax)
rdeneweth@dvs-law.com
achoi@dvs-law.com

Keith A. Schofner (P41852)
LAMBERT LESER
Attorneys for Third-Party Defendant
755 W. Big Beaver Rd., Ste. 410
Troy, MI 48084
(248) 251-1001
kschofner@lambertleser.com

Mark D. Evans (P34517)
MARK D. EVANS, P.C.
Attorney for **Ashmark Construction, LLC**
2232 South Main St., #272
Ann Arbor, MI 48103
(734) 944-2300
(734) 649-8768 (cell)
mdevanslaw@aol.com

_____/

1

EXHIBIT
**3**

Plaintiff Richard A. Penington, by and through his attorneys, Deneweth, Vittiglio & Sassak, P.C., hereby offers pursuant to MCR 2.405 to Stipulate to Entry of a Judgment in favor of Plaintiff Richard A. Penington, and against Ashmark Construction, LLC in the amount of $175,000.00. Said amount includes all costs, interest, and attorney fees.

Please accept or reject in writing, within 21 days after service of this offer, in accordance with MCR 2.405(C). If this offer is rejected, Plaintiff Richard A. Penington, may seek an award for costs and attorney fees in accordance with MCR 2.405(D).

DENEWETH, VITTIGLIO & SASSAK, P.C.

*/s/ Alexander Choi*

Dated: June 22, 2023    By: _____

Ronald A. Deneweth (P27680)
Alexander Choi (P84544)
Attorneys for **Richard A. Penington**
1175 W. Long Lake Road, Suite 202
Troy, MI 48098
(248) 290-0401/8
rdeneweth@dvs-law.com
achoi@dvs-law.com

5758.2/061623 Offer of Judgment

2

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

| | |
|---|---|
| **RICHARD A. PENINGTON**, an individual, | Case No.: 2022-198433-CZ<br>Hon. Nanci J. Grant |

    Plaintiff,

vs.

**ASHMARK CONSTRUCTION, LLC**
a Michigan limited liability company, and
**MARTIN RENEL**, an individual,

    Defendants,

and

**ASHMARK CONSTRUCTION, LLC,**
a Michigan limited liability company,

    Third-Party Plaintiff,

vs.

**LEE INDUSTRIAL CONTRACTING, INC.,**
a Michigan corporation,

    Third-Party Defendant.

_____/

| | |
|---|---|
| Ronald A. Deneweth (P27680)<br>Alexander Choi (P84544)<br>DENEWETH, VITTIGLIO & SASSAK, PC<br>Attorneys for **Richard A. Penington**<br>1175 W. Long Lake Rd., Suite 202<br>Troy, MI 48098<br>(248) 290-0401/08 / (248) 290-0415 (fax)<br>rdeneweth@dvs-law.com<br>achoi@dvs-law.com | Mark D. Evans (P34517)<br>MARK D. EVANS, P.C.<br>Attorney for **Ashmark Construction, LLC**<br>2232 South Main St., #272<br>Ann Arbor, MI 48103<br>(734) 944-2300<br>(734) 649-8768 (cell)<br>mdevanslaw@aol.com |

Keith A. Schofner (P41852)
LAMBERT LESER
Attorneys for Third-Party Defendant
755 W. Big Beaver Rd., Ste. 410
Troy, MI 48084
(248) 251-1001
kschofner@lambertleser.com

_____/

1

## PLAINTIFF RICHARD A. PENINGTON'S
## OFFER OF JUDGMENT

Plaintiff Richard A. Penington, by and through his attorneys, Deneweth, Vittiglio & Sassak, P.C., hereby offers pursuant to MCR 2.405 to stipulate to entry of a judgment in favor of Plaintiff Richard A. Penington, and against Ashmark Construction, LLC in the amount of $144,000.00. Said amount includes all costs, interest, and attorney fees.

Please accept or reject in writing, within 21 days after service of this offer, in accordance with MCR 2.405(C). If this offer is rejected, Plaintiff Richard A. Penington, may seek an award for costs and attorney fees in accordance with MCR 2.405(D).

DENEWETH, VITTIGLIO & SASSAK, P.C.

*/s/ Matthew C. Herstein*

Dated: October 3, 2023

By:_____
    Ronald A. Deneweth (P27680)
    Matthew C. Herstein (P68596)
    Attorneys for **Richard A. Penington**
    1175 W. Long Lake Road, Suite 202
    Troy, MI 48098
    (248) 290-0401/8
    rdeneweth@dvs-law.com
    mherstein@dvs-law.com

5758.2/100223 Offer of Judgment - Ashmark

2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

**RICHARD A. PENINGTON**,
an individual,

Case No.: 2022-198433-CZ
Hon. Nanci J. Grant

       Plaintiff,

vs.

**ASHMARK CONSTRUCTION, LLC**
a Michigan limited liability company, and
**MARTIN RENEL**, an individual,

       Defendants,

and

**ASHMARK CONSTRUCTION, LLC,**
a Michigan limited liability company,

       Third-Party Plaintiff,

vs.

**LEE INDUSTRIAL CONTRACTING, INC.,**
a Michigan corporation,

       Third-Party Defendant.

_____/

Ronald A. Deneweth (P27680)
Matthew C. Herstein (P68596)
DENEWETH, VITTIGLIO & SASSAK, P.C.
Attorneys for **Mr. Penington**
1175 W. Long Lake Rd., Suite 202
Troy, MI 48098
(248) 290-0401/06 / (248) 290-0415 (fax)
rdeneweth@dvs-law.com
mherstein@dvs-law.com

Mark D. Evans (P34517)
MARK D. EVANS, P.C.
Attorney for **Ashmark**
2232 South Main St., #272
Ann Arbor, MI 48103
(734) 944-2300
(734) 649-8768 (cell)
mdevanslaw@aol.com

Keith A. Schofner (P41852)
LAMBERT LESER
Attorneys for **Lee**
755 W. Big Beaver Rd., Ste. 410
Troy, MI 48084
(248) 251-1001
kschofner@lambertleser.com

_____/

**RICHARD PENINGTON'S POST-TRIAL MOTION FOR ATTORNEY'S FEES
AND COSTS PURSUANT TO MCR 2.405(D)**

EXHIBIT
4

## RICHARD PENINGTON'S POST-TRIAL MOTION FOR ATTORNEY'S FEES AND COSTS PURSUANT TO MCR 2.405(D)

PLAINTIFF, Richard Penington ("Mr. Penington"), for his Post-Trial Motion for Attorney's Fees and Costs Pursuant to MCR 2.405(D), says:

1.      This matter came before the Court on a Bench Trial conducted on April 4, 2024, April 5, 2024, September 24, 2024 and December 16, 2024.

2.      The Court, after hearing all evidence presented and having reviewed the parties' post-hearing written submissions, rendered a verdict in favor of Mr. Penington. To this regard, a judgment was entered in Mr. Penington's favor and against Ashmark Construction, LLC ("Ashmark") via the Court's Opinion and Order dated June 13, 2025. The amount awarded in favor of Mr. Penington and against Ashmark was $246,258.06 plus continuing interest.

3.      Well before trial, back in June of 2023, Mr. Penington sent Ashmark an Offer of Judgment, which offered to resolve this matter for $175,000.00 (the "First Offer of Judgment").

4.      Ashmark rejected the First Offer of Judgment.

5.      On October 3, 2023, Mr. Penington sent Ashmark an Offer of Judgment, which offered to resolve this matter for $144,000.00 (the "Second Offer of Judgment").

6.      Ashmark rejected the Second Offer of Judgment.

7.      The case proceeded to trial. As the result of the trial, Mr. Penington received a verdict that was more favorable than the First Offer of Judgment and the Second Offer of Judgment.

8.      This motion seeks reimbursement of attorneys' fees and costs pursuant to MCR 2.405(D).

9.      For billings from October 24, 2023 through June 6, 2025, Mr. Penington has incurred attorneys' fees and costs in the amount of $103,717.20.

10.     The amount of Mr. Penington's attorneys' fees and costs is reasonable and proper; and is recoverable pursuant to MCR 2.405(D).

2

11.    This motion is made pursuant to MCR 2.405(D) and is supported by the attached Brief and its exhibits (including an affidavit of attorney fees and costs).

WHEREFORE, Richard Penington requests that this Honorable Court grant his motion for attorney's fees and costs pursuant to MCR 2.405(D); and that Richard Penington be awarded attorneys' fees and costs for billings from October 24, 2023 through June 6, 2025 in the amount of $103,717.20, and that the judgment in favor of Richard Penington, and against Ashmark Construction, LLC, be correspondingly increased.

Respectfully submitted,

DENEWETH, VITTIGLIO & SASSAK, P.C.

*/s/ Matthew C. Herstein*

Dated:  June __, 2025          By: _____
Matthew C. Herstein (P68596)
Attorneys for **Richard A. Penington**
1175 W. Long Lake Rd., Suite 202
Troy, MI  48098
(248) 290-0401/06
mherstein@dvs-law.com

3

## BRIEF IN SUPPORT OF RICHARD PENINGTON'S POST-TRIAL MOTION FOR ATTORNEY'S FEES AND COSTS PURSUANT TO MCR 2.405(D)

This case arises out of Ashmark Construction, LLC's ("Ashmark") various breaches of contract, which caused Richard Penington ("Mr. Penington") to incur significant damages. To this end, two (2) contracts were signed by both Mr. Penington and Ashmark for the interior construction of a high-end garage located at Unit 197 of the M1 Concourse in Pontiac, Michigan (the "Project"). The first contract was for the construction of a steel mezzanine (the "Mezzanine Contract") and the second contract was for the construction of much of the remaining interior buildout work (the "Interior Buildout Contract"). Ashmark collected $504,759.45 from Mr. Penington concerning the Mezzanine and Interior Buildout Contracts. Much of these funds were paid in advance of the work being performed. However, Ashmark only performed $282,022.99 worth of work. Thus, Ashmark was overpaid by at least **$222,736.46** ($504,759.45 - $282,022.99). Ashmark was terminated, for cause, and then refused to repay Mr. Penington any of the funds that it had received in advance.

In both June and October of 2023, respectively, Mr. Penington sent Ashmark two (2) offers of judgment, seeking to resolve this case without the need for trial. Copies of the applicable offers of judgment are attached as **Exhibits 1 and 2**. Ashmark rejected both offers of judgment and did not make any counteroffers. This matter ultimately went to trial; and on June 13, 2025, this Honorable Court entered its Opinion and Order, which granted Mr. Penington a judgment, in his favor, and against Ashmark, in the principal amount of $246,258.06. A copy of the applicable Opinion and Order is attached for convenience as **Exhibit 3**.

Since Mr. Penington prevailed at trial, he is now entitled to collect his attorney fees and costs pursuant to MCR 2.405(D), since the time when Ashmark rejected the offer of judgment. The applicable attorney fees and costs, that Mr. Penington is entitled to recover, are $103,717.20. **Exhibit 4**. This amount should be added to Mr. Penington's judgment against Ashmark.

4

**A.** **Mr. Penington is Entitled to Recover His Attorneys' Fees and Costs, Pursuant to MCR 2.405.**

MCR 2.405 allows parties to Offer to Stipulate to Entry of Judgments. Pursuant to MCR 2.405(C), a party can accept an offer of judgment within 21 days of the date when the offer was made. In the event that an offer made pursuant to MCR 2.405 is rejected, MCR 2.405(D) allows for the imposition of costs following rejection. To this end, MCR 2.405(D) provides, in pertinent part:

> **(D) Imposition of Costs Following Rejection of Offer.** If an offer is rejected, costs are payable as follows:
> (1) If the adjusted verdict is more favorable to the offeror than the average offer, the offeree must pay to the offeror the offeror's actual costs incurred in the prosecution or defense of the action.

Under this rule, the "adjusted verdict" means the verdict plus interest and costs from the filing of the complaint through the date of the offer. See MCR 2.405(A)(5). Furthermore, "actual costs" are defined as: "the costs and fees taxable in a civil action and a reasonable attorney fee, dating to the rejection of the prevailing party's last offer or counteroffer, for services necessitated by the failure to stipulate to the entry of judgment". See MCR 2.405(A)(6).

"Generally, attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 297; 769 NW2d 234 (2009). Under MCR 2.405(D), however, a trial court must order the party who rejected an offer of judgment to pay the other party's reasonable attorney fees if the offeror obtained a verdict that was more favorable than the average offer—unless the court determines that it is in the interests of justice to refuse the award. This is known as the offer-of-judgment rule. See *Simcor Constr, Inc v Trupp*, 322 Mich App 508, 514; 912 NW2d 216 (2018). The purpose of the rule is to encourage the parties to settle their disputes and prevent protracted litigation. *Id.* at 514-515.

In this case, Mr. Penington made several attempts to resolve this case via offers of judgment. The first such offer was made on June 22, 2023, when Mr. Penington offered to resolve his claims against Ashmark for a judgment of $175,000.00. **Exhibit 1**. Ashmark did not respond

to that offer. On October 3, 2023, Mr. Penington offered to resolve his claims against Ashmark for a reduced judgment of $144,000.00. **Exhibit 2**. Again, Ashmark did not respond. "If a party has made more than one offer, the most recent offer controls for the purposes of this rule." MCR 2.405(A)(1).

This matter then went to trial before the Honorable Nanci J. Grant. On June 13, 2025, Judge Grant entered her Opinion and Order, which resolved this matter by awarding Mr. Penington a judgment in his favor and against Ashmark in the amount of $246,258.06, plus continuing interest. **Exhibit 3**. Since the Court's verdict was over $100,000.00 more favorable to Mr. Penington, than his October 3, 2023 offer of judgment, MCR 2.405(D) provides that Ashmark (the "offeree") must pay to Mr. Penington (the "offeror") his actual costs incurred in the prosecution of his claims.

Mr. Penington's "actual costs" in this case are "the costs and fees taxable in a civil action and a reasonable attorney fee, dating to the rejection of the prevailing party's last offer or counteroffer, for services necessitated by the failure to stipulate to the entry of judgment". See MCR 2.405(A)(6). Since Ashmark did not accept the October 3, 2023 offer of judgment within 21 days, Ashmark is deemed to have rejected Mr. Penington's offer of judgment as of October 24, 2023. See MCR 2.405(C).

Mr. Penington's attorneys' fees and costs, incurred after October 24, 2023 are $103,717.20. See **Exhibit 4**. Mr. Penington is entitled to recover these costs. MCR 2.405(D).

**B.**    **Mr. Penington's Fees and Expenses are Reasonable In Light of the Facts and the Complexity of the Litigation.**

Mr. Penington's attorneys' fees are reasonable under applicable law and the facts of this case. The Supreme Court articulated the standard for determining the "reasonableness" of a request for attorneys' fees in *Smith v. Khouri*, 481 Mich. 519, 522, 751 N.W.2d 472 (2008).

> [T]he trial court should begin the process of calculating a reasonable attorney fee by determining factor 3 under MRPC 1.5(a), *i.e.,* the reasonable hourly or daily rate customarily charged in the locality for similar legal services, using reliable surveys or other credible evidence. This

6

number should be multiplied by the reasonable number of hours expended. This will lead to a more objective analysis. After this, the court may consider making adjustments up or down in light of the other factors listed in *[Wood v. Detroit Auto. Inter-Insurance Exchange*, 413 Mich. 573, 321 N.W.2d 653 (1982)]* and MRPC 1.5(a).

In determining the "reasonableness" of attorneys' fees requests, the Court in *Smith v. Khouri* provided further guidance, and the Court stated at page 529 (*citations omitted*):

In Michigan, the trial courts have been required to consider the totality of special circumstances applicable to the case at hand. *Wood* listed the following six factors that were to be considered in determining a reasonable attorney fee:

(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. [*Wood*, 413 Mich. at 588, 321 N.W.2d 653].

The trial courts have also relied on the eight factors listed in Rule 1.5(a) of the Michigan Rules of Professional Conduct ... which overlap the *Wood* factors....

\*\*\*

In determining "the fee customarily charged in the locality for similar legal services," the trial courts have routinely relied on data contained in surveys such as the Economics of the Law Practice Surveys that are published by the State Bar of Michigan. The above factors have not been exclusive, and the trial courts could consider any additional relevant factors. *Wood*, 413 Mich. at 588, 321 N.W.2d 653.

The hourly rates charged to Mr. Penington were reasonable (and within the mid-range of rates charged by other similarly situated lawyers as described in the 2023 edition of the STATE BAR OF MICHIGAN "Economics of Law Practices in Michigan", **Exhibit 5**).[1] Specifically, the State Bar listed the following rates charged by attorney practitioners based on the following metrics:

**Hourly Billing Rates by Years in Private Practice for Private Practitioners (Pg. 8)**

| Years in Practice | Mean | 75th Percentile | 95th Percentile |
|---|---|---|---|
| 16 to 25 | 337 | 425 | 600 |

---

[1] 2023 is the most recent edition of the STATE BAR OF MICHIGAN "Economics of Law Practices in Michigan".

**Hourly Billing Rates by Primary Office Location (Pg. 9)**

| Primary Office Location | Mean | 75th Percentile | 95th Percentile |
|---|---|---|---|
| Oakland County (S. of M-59) | 354 | 425 | 600 |

**Hourly Billing Rates by Field of Practice for Private Practitioners (Pg. 10)**

| Field of Practice | Mean | 75th Percentile | 95th Percentile |
|---|---|---|---|
| Construction Law | 323 | 405 | 540 |
| Civil Litigation | 351 | 425 | 625 |

**Hourly Billing Rates by County for Private Practitioners (Pg. 13)**

| County | Mean | 75th Percentile | 95th Percentile |
|---|---|---|---|
| Oakland | 356 | 425 | 637 |

**Hourly Billing Rates by Circuit for Private Practitioners (Pg. 13)**

| Primary Circuit | Mean | 75th Percentile | 95th Percentile |
|---|---|---|---|
| 6th Circuit – Oakland | 356 | 425 | 637 |

Under each of the above metrics, Deneweth Vittiglio & Sassak, P.C.'s ("DVS") hourly rates are reasonable. DVS's hourly rate of $395/hour (for Matthew C. Herstein) are just above the "mean" (*i.e.,* commonly known as the average). Further, the rates are well-below the hourly rates at the 75th percentile (*i.e.,* half of those surveyed by the State Bar stated rates between the 25th and the 75th percentile, and DVS's rates are right in the middle of that range).

The reasonableness of the attorney fee charges (both the rates and the amounts) is further demonstrated by analysis under the factors articulated in *Wood v. Detroit Auto Inter-Insurance Exchange*, 413 Mich. 573, 588, 321 N.W.2d 653 (1982). Examples of the reasonableness of Mr. Penington's attorneys' fees under the *Wood* factors include:

1. *Wood* **Factor #1: "The professional standing and experience of the attorney".**

Matthew C. Herstein is a licensed attorney who has been practicing construction law since 2005. Mr. Herstein holds a Juris Doctor from the University of Nebraska (2005) and earned a Bachelor's Degree from the University of Michigan (2002). Mr. Herstein is a partner at Deneweth, Vittiglio & Sassak, P.C., and his *curriculum vitae* is attached as **Exhibit 6**.

2. *Wood* **Factor #2: "The skill, time and labor involved".**

Construction cases pose significant issues both from a legal and a subject-matter perspective and often involve a voluminous amount of documents. This action involved several

construction contracts, a contractor that was deliberately withholding information from Mr. Penington, numerous breaches of contract by Ashmark, an expert to review the work completed by Ashmark and analyze the amounts owed to Mr. Penington, among other things.  As an example of the case's complexity, one can look at Ashmark's exhibit binder alone, which consisted of exhibits A through U-6 (151 exhibits).

3.   ***Wood* Factor #3: "The amount in question and the results achieved".**

The amount at issue and the result achieved at trial was favorable to Mr. Penington. Specifically, Mr. Penington prevailed at trial and received a verdict in his favor in the amount of $246,258.06, plus continuing interest.  **Exhibit 3**.

4.   ***Wood* Factor #4: "The difficulty of the case".**

This action involved a complex construction project with testimony from a construction expert, an architect, cost estimates, over 200 trial exhibits (including exhibits of Mr. Penington, Ashmark and Lee Contracting), a variety of legal theories, the processing and analysis of voluminous discovery from multiple parties, multiple pre-trial motions, and four days of trial testimony.

5.   ***Wood* Factor #5: "The expenses incurred".**

The expenses incurred by Mr. Penington include charges of $1,843.20, plus litigation expenses necessarily incurred in preparation for trial (such as copy costs for Plaintiff's exhibit binders, etc.).   The expenses were reasonably incurred in connection with the legal representation.

6.   ***Wood* Factor #6: "The nature and length of the professional relationship with the client".**

Attorneys at Deneweth, Vittiglio & Sassak, P.C. were specifically retained by Mr. Penington for this matter due to their construction law expertise, and the need to recover the amounts that Ashmark was refusing to refund, despite its failure to perform the work that it was paid to perform. This was the first matter where Mr. Herstein has represented Mr. Penington, but they have since worked on several other matters.

9

**7.** **Mr. Penington's attorneys' fees and costs are reasonable under the Michigan Rules of Professional Conduct, and are Owed Under MCR 2.405(D)(1).**

Mr. Penington's attorneys' fees and costs are reasonable under MRPC 1.5(a) (which assesses attorneys' fees based on "factors" substantially similar to the *Wood* factors).[2] In sum, under each of the applicable factors and measures, Mr. Penington's request for an award of his attorney fees, costs, and expenses is reasonable, and reimbursement by Ashmark is required pursuant to MCR 2.405(D).

**D.** **Request for Relief.**

WHEREFORE, Richard Penington requests that this Honorable Court grant his motion for attorney's fees and costs pursuant to MCR 2.405(D); and that Richard Penington be awarded attorneys' fees and costs for billings from October 24, 2023 through June 6, 2025 in the amount of $103,717.20, and that the judgment in favor of Richard Penington, and against Ashmark Construction, LLC, be correspondingly increased.

Respectfully submitted,

DENEWETH, VITTIGLIO & SASSAK, P.C.

*/s/ Matthew C. Herstein*

Dated:  June __, 2025                    By: _____
Matthew C. Herstein (P68596)
Attorneys for **Richard A. Penington**
mherstein@dvs-law.com

5758.2/25 0618 Penington Motion and Brief for Atty Fees

---

[2] MRPC 1.5(a) provides, "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee. A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent."

25-46693-tjt    Doc 60-1    Filed 10/23/25    Entered 10/23/25 14:05:42    Page 33 of 37

# ASHMARK CONSTRUCTION

## Construction Proposal

| | |
|---|---|
| M1 Concourse | 9/14/2021 |
| Submitted to: | Date |
| Unit 197 – Richard Penington | Martin Renel |
| Job | Prepared by: |

### Structural Mezzanine Quotation

| ITEM | Cost | Comments |
|---|---|---|
| **DIV. 1 GENERAL REQUIREMENTS** | | |
| Permits & Fees | 2,500.00 | Bid Allowance |
| Supervision | 3,500.00 | On site project Manager |
| Structural Engineering | - | By others |
| General Conditions | 1,848.00 | Debris removal, cleanup, Insurance, |
| Temp. Safety Railings | 4,760.00 | Per OSHA |
| **DIV. 5 METALS** | | |
| Structural Steel mezzanine with (2) sets of stairs | 189,199.00 | Per structural Plan |
| Foundations | - | Not Required |
| T&G Plywood subfloor | - | Included |
| Handrails | - | Not Included |
| **DIV. 15 MECHANICAL** | | |
| Fire Protection | - | Not Included |
| GC Fee | 18,169.00 | |
| **Total** | **219,976.00** | |

**EXCLUDES**
Tap Fees, Bonds, Utility Fees
Overtime or Phasing
Electrical and fire suppression
Painting of Mezzanine

Respectfully submitted,

*Martin J. Renel*

Martin J. Renel, Managing Member

Accepted By:

---

**EXHIBIT**

5

**CONTRACTOR:**

**ASHMARK Construction, LLC**

5640 West Maple Road, Suite 300
West Bloomfield, MI 48322-3717

**Richard Penington**

# SERVICE CONTRACT

All correspondence, invoices and shipments must refer to this contract number.

Contract Number: 21-873

This Contract covers the Work (herein called "Work" or "Services") described below.

The Work or Services will be performed at: Unit 197 @ M1 Concourse, Pontiac, MI (herein called the "Work Site" or "Services Site").

This Contract is subject to all conditions hereon and as shown on Exhibit "A".

1. Contractor will provide the Work and Services for the following described Plans and Specifications or Scope of Work:

   **Scope of Work:** M1 Garage Construction Mezzanine as per ASHMARK Construction proposal dated 9/14/2021.

   **Plans and Specifications:** Preliminary Plans- Schematic Structural dated 9.07.21.

2. Contractor will complete the Work or Services on or before the Completion date, or during the Contract period below:

   **Completion:** Approximately 2 weeks after Construction start - unless project is delayed by reasons beyond the control of the contractor

   **Contract date:** 9.22.2021

3. In consideration for the performance of the Work or Services, Owner will pay to Contractor the following sums of money (the "Contract Price") as shown below or in an attached payment schedule.

   **Contract Price:** $ 219,976.00

   **Progress Payment Schedule:**
   50% down at Execution of Contract; 50% upon Completion.
   Payments to be made within (10) days of submission to Owner.

   **Special Conditions:**
   All terms and conditions on Exhibit "A" shall apply. This contract does not cover or address property conditions not specifically covered in the plans and specifications, which may result in additional charges to Owner.

NOTE: THIS CONTRACT MUST BE ACKNOWLEDGED BY EXECUTING AND RETURNING FULLY EXECUTED COPIES WITHIN TEN DAYS OF ISSUE DATE. THIS CONTRACT SHALL BE VALID WHEN SIGNED BY AUTHORIZED AGENT (S) OF CONTRACTOR.

| ACCEPTED BY OWNER: | CONTRACT ISSUED BY CONTRACTOR: |
|---|---|
| By: _____ Owner  *Signature*  *Title* | By: _____ Managing Member  *Signature*  *Title* |
| Date: September 23, 2021 | Date: 9/23/21 |

**EXHIBIT**
**6**