UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 25-46693-tjt

Ashmark Construction, LLC,                      Chapter 11, Subchapter V

        Debtor.                              Hon. Thomas J. Tucker

_____/

### *FIRST AMENDED*
## CHAPTER 11, SUBCHAPTER V PLAN OF REORGANIZATION

Ashmark Construction, LLC, debtor and debtor-in-possession in the above captioned case ("Debtor" or "Ashmark"), by and through its attorneys, files this *First Amended Chapter 11, Subchapter V Plan of Reorganization* (hereinafter, the "Plan" which incorporates by reference *Chapter 11, Subchapter V Plan of Reorganization Dated September 29, 2025* [ECF No. 49] (the "First Plan")[1] and its exhibits).[2] In support, the Debtor respectfully states as follows:

**THE PLAN AS AMENDED HEREIN PROPOSES AN INCREASE IN DISTRIBUTIONS TO CLASS 2 CREDITORS AND HAS NO MATERIAL ADVERSE IMPACT ON CREDITORS OR PARTIES IN INTEREST.**

---

[1] This Plan shall govern to the extent of any conflict with the provisions set forth herein and the First Plan.

[2] Attached hereto as **Exhibit 1** is a redline copy of the Plan reflecting changes from the First Plan.

1

**THEREFORE, THE COURT'S *AMENDED NOTICE OF ORDER ESTABLISHING DEADLINES AND PROCEDURES IN A SUBCHAPTER V CASE* [ECF NO. 64] (THE "<u>AMENDED SCHEDULING ORDER</u>") REMAINS IN EFFECT. PLEASE REFER TO THE AMENDED SCHEDULING ORDER REGARDING DEADLINES APPLICABLE TO CONFIRMATION OF THE PLAN.**

### A. Description and History of the Debtor's Business

### 1. Nature and History of Debtor's Business

Ashmark is a Michigan limited liability company formed for the purpose of providing construction project management services for the build-out of commercial properties with a primary focus on retail locations and professional office space. Ashmark's revenue is derived from fees it charges to customers for its construction project-management services net of subcontractor costs. Other than its operating cash, Ashmark has minimal assets to perform its services for clients and its value as a business is primarily held in its customer goodwill.

### 2. Legal Structure of the Ownership of Debtor

Ashmark is comprised of three full-time employees and three members: the Ashley J. Israel Revocable Living Trust (the "<u>Israel Trust</u>"), the Marc S. Weinbaum Revocable Living Trust (the "<u>Weinbaum Trust</u>"), and Martin Renel ("<u>Renel</u>" and together with the Israel Trust and the Weinbaum Trust, the "<u>Members</u>"). Renel is

2

Docusign Envelope ID: 0ECB15EB-0687-48E2-919A-AF9C8DAD82EF

Ashmark's managing member ("Manager"), he is the responsible person for the Debtor and the only member who is also employed by Ashmark. The membership of Ashmark is made up of two classes: Class A, comprised of its members – the Israel Trust (33.33%), the Weinbaum Trust (33.34%), and Renel (28.33%); and Class B, comprised of its Manager – Renel (5%).

### 3. Events Leading to the Filing of Debtor's Chapter 11 Case

For over 20 years, Ashmark has been a successful and profitable company, and up until the recent legal disputes described herein, it operated its business free from controversy other than its own customer collection matters. Ashmark sought bankruptcy protection under Chapter 11, Subchapter V of the Bankruptcy Code in the wake of two litigation matters: (1) a state court judgment (the "Pennington Judgment")[3] in favor of its former customer, Richard Pennington ("Pennington"); and (2) pending arbitration litigation with M1 Concourse, LLC ("M1").[4]

***Pennington Litigation and Judgment Put Operations at Risk***

---

[3] The Pennington Judgment was entered on June 13, 2025 in the State of Michigan, Oakland County Circuit Court Case No. 2023-198433-CZ (the "State Court Judgment").

[4] M1 is an 87-acre motorsports venue that also houses private "car condos" for vehicle storage in temperature-controlled spaces that include car-lifts, and include kitchenettes, full bathrooms, and other accommodations.

3

The Pennington Judgment arose from a construction project for which Pennington contracted with Ashmark to complete a custom build-out of a car condominium unit at M1 (the "Project"). During the Project, various disagreements arose between Pennington and Ashmark regarding the scope and cost of the Project. Following a bench trial, judgment was entered against Ashmark and in Pennington's favor in the principal amount of $222,736.46[5] plus judgment interest of $23,521.60 for a total of $246,258.06.

### M1 Litigation Further Constrained Ashmark's Finances

The M1 litigation arose from a dispute over the terms of a Master Subcontractor Agreement (the "Agreement") related to developer fees that M1 alleges Ashmark owes for construction project management services that Ashmark performed for certain M1 car condominium owners. Ashmark has asserted counter-claims against M1 on unjust enrichment grounds for overpayment of developer fees on its mistaken belief that the Agreement was enforceable and in particular, related to Ashmark's payments to M1 that were made after the Agreement would have expired under its terms if it ever were in effect. M1 has claimed damages against Ashmark in the amount of $283,593.93 and Ashmark has claimed damages against M1 in the amount of $276,056.38.

---

[5] This amount reflects what the court determined were damages for Pennington's overpayment to Ashmark for its services in connection with the Project.

### *Pennington Judgment and M1 Litigation Precipitated Bankruptcy Filing*

Ashmark sought bankruptcy protection because it did not have sufficient cash or assets on hand to satisfy the Pennington Judgment and to continue to operate its business without material interruption. Ashmark determined its only options to resolving the Pennington Judgment were to file for bankruptcy protection or go out of business upon Pennington's enforcement of his judgment remedies e.g. bank account garnishments. A bank garnishment posed serious risk of wiping out all of Ashmark's operating cash and would expose its customers to the risk that, at any time, customer deposits intended for payment of subcontracted construction services could be swept for a garnishment, which would have deepened Ashmark's insolvency. Rather than face that risk, Ashmark presents this Plan which will provide payments to creditors while allowing Ashmark to continue its operations.

### 4. Significant Events During the Bankruptcy Case

There have been no significant events that have occurred during this Bankruptcy Case. Ashmark has no secured creditors with an interest in its cash, therefore Ashmark did not require relief from the court for use of cash collateral, its employee wages were up to date on the Petition Date and there have been no outside the ordinary course transactions.

### B. Plan Funding Sources

The Debtor will fund the payment of (a) all administrative expense claims;

5

and (b) creditor claims described in this Plan. The source of Debtor's Plan funding will be member contributions, to the extent required and Debtor's disposable income from the ongoing operation of Debtor's business.

### C. Management of Debtor Following Plan Confirmation

Following confirmation of the Plan, Debtor will be operated by Renel—Ashmark's managing member. Renel's continued management of Debtor is consistent with the interests of creditors and equity security holders and with public policy. Renel is in the best position to maximize Ashmark's goodwill as he has served as the face of Ashmark's customer relationships since its inception. As compensation for services Renel will be paid an annual salary of $118,000. Additionally, Debtor will continue to pay for Renel's use of a company vehicle and will reimburse Renel's expenses that are reasonable and necessary for Renel to perform his job duties for Debtor.

### D. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest holders would receive in a chapter 7 liquidation. The

liquidation analysis required by Section 1190 of the Bankruptcy Code[6] is attached to the First Plan as **Exhibit A**.

### 1. Projected Recovery of Avoidance Actions

The Debtor has reviewed its prepetition transfers made within the preference period and has not identified any potential preference claims that would realize cash to fund the Plan. Notwithstanding, the Debtor reserves the authority to pursue through an adversary proceeding any preference claim that has not yet been identified. Any such proceeds recovered after confirmation will be used to fund the obligations under the Plan.

### 2. Insider Transactions

The Debtor's insiders consist of the Members (collectively, the "Insiders"). The Insiders received the following payments from the Debtor :

| | | | |
|---|---|---|---|
| Israel Trust | January 9, 2024 | $25,000.00 | Profit Distribution |
| Weinbaum Trust | January 9, 2024 | $25,000.00 | Profit Distribution |
| Martin Renel | January 9, 2024 | $50,000.00 | Profit Distribution |
| Martin Renel | July 1, 2024-<br>June 30, 2025 | $79,719.63 | Salary |

---

[6] The "Bankruptcy Code" shall mean Title 11, United States Code, Section 101 *et. seq.*

7

(the "Insider Payments"). The Insider Payments that are attributed to Profit Distributions were made at a time when Ashmark was solvent and the Profit Distributions did not render Ashmark insolvent. The Insider Payments that are attributed to Salary were made in consideration of Renel's services to Ashmark as its manager. Renel performs services including the day-to-day operations of Ashmark and the Salary is reasonable.

### 3. Other Causes of Action

Ashmark may require to continue the M1 litigation through arbitration in order to determine the liquidated amount of M1's claim, if any, as well as for Ashmark to liquidate its claim against M1. Therefore, Ashmark preserves all of its claims against M1. Other than the M1 lawsuit, Ashmark does know of any other causes of action that may be available to it. However, that there are no known causes of action is not a waiver of any existing claims or causes of action that Ashmark may discover at any time. Furthermore, Ashmark reserves all right title and interest to any claims or causes of action that it may discover. As of the Effective Date (as defined in Article 12 Section 2 below), the post-confirmation injunction shall be waived solely with respect to the M1 litigation so the parties may continue the arbitration.

### 4. Ability to Make Future Plan Payments and Operate Without Further Reorganization

Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. Projections that support the Debtor's ability to make all payments required by the Plan are attached to the First Plan as **Exhibit B.** *See* Section 1190 of the Bankruptcy Code.

Ashmark's financial projections show that the it will have projected disposable income (as defined by Section 1191(d) of the Bankruptcy Code) for the period described in Section 1191(c)(2) of the Bankruptcy Code in the amount of $142,243.00. The final Plan payment is expected to be paid on or about January 15, 2029.

In addition to contributing Ashmark's projected disposable income for the 3-year post-confirmation period to the Plan, Ashmark or its members will contribute an additional $225,000 in three annual installments of $75,000 to be paid on January 15, 2026, January 15, 2027 and January 15, 2028 (the "Additional Unsecured Creditor Distribution").[7]

## ARTICLE 1: SUMMARY

This Plan under chapter 11 subchapter V of the Bankruptcy Code proposes to pay creditors of Ashmark from its operating profits over the period of 3 years plus

---

[7] This additional payment assumes arguendo that the profit distributions that Ashmark's members received more than two years prior to the Petition Date would have been reduced by the amount of $222,736.46 which the state court found to be the amount of Pennington's overpayment to Ashmark.

the Additional Unsecured Creditor Distribution. Distributions of the projected disposable income to Class 2 Non-Priority Unsecured Creditors will be made on a quarterly basis with the first distribution to be made on April 15, 2026 and with each subsequent distribution to be made on the 15th of each month following each calendar quarter with the final distribution estimated to occur on or before January 15, 2029. The Additional Unsecured Distribution will be paid in three annual installments as described herein above.

This Plan provides for:

**1.01   Payment of non-priority unsecured claims.** Non-priority unsecured creditors holding allowed claims will receive pro rata distributions from a total projected disposable income of $142,243.00 plus the Additional Unsecured Creditor Distribution, or $225,000, to be contributed by Ashmark or its members for a total distribution to unsecured creditors of $367,243.00. If unsecured claims are deemed allowed claims in the amount that Debtor has estimated such claims herein below, the Plan will provide creditors a distribution that amounts to between 57 and 100 cents on the dollar.[8] However, if the Debtor's allowed administrative expense claims

---

[8] If Pennington's claim is allowed in the full amount of his Proof of Claim No. 4-1, or $349,975.26, but subject to the Administrative Carve-Out (*see* Article 1, Section 1.03). Because, if Ashmark prevails in arbitration with respect to M1 (*see* Article 2, Class 2), Pennington will receive payment in full on account of his claim however, Ashmark reserves the right to object to the amount of his claim.

exceed $100,000, the Debtor's Plan payments shall first be applied to the satisfaction of its allowed administrative expenses in excess of $100,000 and in such case, distributions to Ashmark's unsecured creditors will be reduced by a corresponding amount (the "Administrative Carve-Out").

 **1.03 Payment of administrative expenses and priority claims:** This Plan provides for full payment of administrative expenses and priority claims. Administrative expenses are estimated as follows: Subchapter V Trustee (the "Trustee") $7,500.00; and Debtor's Counsel, Taft Stettinius & Hollister, LLP ("Counsel") $75,000, UHY Advisors, Inc., $20,000 ("Administrative Expenses"). Payment of the Administrative Expenses is subject to court approval upon the timely request of the Trustee and Counsel. The Debtor has a retainer deposit balance of $15,000 and sufficient cash on hand from which to pay Administrative Expenses in full.

 All creditors and equity security holders should refer to Articles 2 through 6 of this Plan for information regarding the precise treatment of their claim.

## ARTICLE 2: CLASSIFICATION OF CLAIMS AND INTERESTS

 **2.01 Class 1.** Secured Claim of AmeriCredit Financial Services, Inc. d/b/a GM Financial ("GM Financial"). **Not Impaired. Not entitled to vote on the plan.**

Amount of claim:   $ 4,117.10

Estimated Value of Collateral: $ 15,179.00 to 24,650.00[9]

GM Financial was satisfied on its claim pursuant to the Court's *Order Granting Debtor's Motion for Entry of an Order to Purchase Vehicle Outside Ordinary Course of Business, Trade in Vehicle, and Pay Off Lien, and Cancelling October 29, 2025 Hearing* [ECF No 70].

**2.02 Class 2.** All non-priority unsecured claims allowed under section 502 of the Bankruptcy Code. **Impaired. Entitled to vote on the plan.**

There are two non-priority unsecured creditors, Pennington and M1, the unsecured creditors' claims will be deemed allowed for Plan voting purposes only. Debtor reserves the right to later object to the validity and the amount of the filed claims. Pennington's State Court Judgment amount is 246,258.06 and M1's claim is $283,583.93[10], and is disputed and contingent upon the final result of arbitration and subject to setoff by Ashmark's claim against it of $276,056.38. Distributions are subject to the Administrative Carve Out (*see* Article 1, Section 1.01).

If, hypothetically, Ashmark's claim against M1 is reduced to $0.00 and M1 is granted an arbitration award in the face amount of its demand, then the pro rata

---

[9] Debtor estimated the value of the collateral in its schedules as $15,179 and GM Financial estimated the value of its collateral at $24,650 in its proof of claim. In either case, GM Financial is fully secured.

[10] However, Pennington filed a claim in the amount of $349,975.26 without sufficient documentation for Ashmark to determine the validity in the amount of Pennington's proof of claim (*see* Proof of Claim No. 4-10).

percentage allocation of Pennington's claim (if allowed) to M1's claim is as follows:[11]

46 percent: Pennington

54 percent: M1

If Pennington's claim is allowed, then Ashmark will make a pro rata distribution to Pennigton on account of his claim and calculated on the hypothetical allowance of the M1 claim in its entire amount without setoff for Ashmark's claim against M1. Ashmark will make a pro rata distribution attributed to M1's claim into an escrow account that will be disbursed based on one of the following outcomes: (a) in full to M1 upon entry of an arbitration award in M1's favor and denying Ashmark's counter-claim in full; (b) in part to M1 based on a re-calculated pro-rata distribution to M1 upon entry of an arbitration award in M1's favor less any arbitration award in favor of Ashmark; or (c) no distribution will be made to M1 provided the arbitration award to Ashmark is greater than the arbitration award, if any, to M1. In all circumstances, Ashmark reserves the right, but not the obligation, to compromise and settle M1's claims without arbitration and Ashmark may then allocate Plan payments between M1 and Pennington (if allowed) according to the

---

[11] This pro rata claim allocation is subject to final adjustments for other allowed general unsecured claims or according to the final allowed amount of the M1 and Pennington general unsecured claims.

above described disbursement terms for M1's compromised claim amount. Debtor will propose terms in its order confirming the Plan that allows for Ashmark to continue arbitration with M1 unless otherwise settled or compromised.

If M1's claim is reduced or disallowed as described above then any residual escrow account balance, up to the full amount of the escrow balance will be disbursed to Pennington on account of his claim to the extent that his claim is deemed allowed. Any surplus amount on deposit in the escrow account in excess of Pennington's allowed claim, subject to Ashmark's right to object to the amount of Pennington's claim, will be retained by Ashmark.

Plan payments that come due, if at all, after the conclusion of the M1 arbitration, will be paid directly to M1 based on the final pro-rata calculation of M1's claim.

or

Any difference in the pro-rata plan payment amount that would have been paid to M1 will instead be paid to Pennington up to 100 percent of his claim, if his claim is deemed allowed.

If Ashmark receives an arbitration award greater than any amount awarded to M1, upon Ashmark's receipt of payment from M1 of such award, Ashmark will first apply any recovery from M1 to payment of Ashmark's legal expenses attending to its representation in the M1 arbitration proceeding and any subsequent collection

14

costs it may incur, Ashmark will retain at least 50 percent of any net arbitration award receipt and will disburse up to 50 percent of any net arbitration award receipt to Pennington if his claim is deemed allowed but only to the extent that it fully satisfies the allowed amount of his claim.

**2.03   Class 3.** Equity interests of the Debtor. **Impaired. Entitled to vote on the plan.**

On the Effective Date of the Plan, the Members, will retain their membership interests in Ashmark according to their current percentage allocation of membership. Notwithstanding their retention of membership interests, all projected disposable income which would otherwise be profit of Ashmark due to its members, will instead be disbursed to Class 2 creditors for the life of the Plan. In addition to Ashmark's projected disposable income, Ashmark or its members will also contribute $225,000 in three annual installments of $75,000 as described herein (*see* Article 1, Section 1.01). Except that nothing in this Plan is intended to nor does it create liability of Ashmark's members to its creditors as identified in the Plan or any unknown or future creditors of Ashmark.

## ARTICLE 3: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS, AND QUARTERLY AND COURT FEES

**3.01: Unclassified claims.** Under section 1123(a)(1) of the Bankruptcy Code, allowed administrative expenses and priority tax claims are not classified claims.

**3.02: Administrative expenses.** Administrative Expenses allowed under

15

section 503 of the Bankruptcy Code will be paid in full upon court approval of the same following confirmation of the Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

**3.03: Priority tax claims.** Other than employee withholding taxes that have accrued and been paid in the ordinary course of business, there are no priority tax claims due to be paid under the Plan.

## ARTICLE 4: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**4.01 Claims and interests are treated as follows under this Plan:**

## ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.01 Disputed claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either:

(a) A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

**5.02: Delay of distribution on a disputed claim.** No distribution will be made on account of a disputed claim unless and until it is allowed.

**5.03: Settlement of disputed claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9019.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND

16

UNEXPIRED LEASES

### 6.01 Assumption/Rejection of Leases and Contracts

The Debtor assumes, and if applicable assigns to the reorganized Debtor, the executory contracts and unexpired leases as of the effective date of the Plan that are identified in the attached **Exhibit C**.

### 6.02 Deadline to File Claims for Rejected Leases and Executory Contracts

Except for executory contracts and unexpired leases that have been assumed, and if applicable, assigned pursuant to this Plan and an order confirming the Plan, will be conclusively deemed rejected as of the Effective Date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 14 days after the date on which the court enters the order confirming this Plan.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Debtor will implement the plan by continuing its usual business operations as a construction manager. Debtor will fund the plan by dedicating its projected disposable income over a period of three years plus the Additional Unsecured Creditor Distribution.

## ARTICLE 8: EFFECT OF CONFIRMATION OF PLAN AND INJUNCTION

### 8.01 Discharge

If the Debtor's Plan is confirmed under section 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any debt

17

that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt:

> (i)  imposed by this Plan; or

> (ii) to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

If the Debtor's Plan is confirmed under section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in section 1192 of the Bankruptcy Code. The Debtor will not be discharged from any debt:

> (i)  on which the last payment is due after the first 3 years of the plan, or as otherwise provided in section 1192 the Bankruptcy Code; or

> (ii) excepted from discharge under section 523(a) of the Bankruptcy Code, except as provided in Bankruptcy Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

**8.02 Binding Effect of Plan.**

Upon the Effective Date (defined below), the Plan and each of its provisions shall be binding on Debtor, all Creditors, all Equity Interest holders, and all Persons acquiring property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or

Equity Interest held by any of them is Impaired under the Plan, whether or not any

Claim or Equity Interest held by any of them is Allowed in full, only in part, or

Disallowed in full, and whether or not a Distribution is made to any of them under

the Plan. This provision includes all successors and assigns of the parties named

herein.

### 8.03 Vesting of Assets.

Upon the Effective Date, all assets of Debtor's shall vest in the Debtor, except

as otherwise provided in the Plan.

### 8.04 Injunction

Confirmation of the Plan will result in the issuance of a permanent injunction

against the commencement or continuation of any judicial, administrative, or other

action or proceeding on account of any Claims against Debtor that arose prior to the

Confirmation Date, unless such action is authorized by the Plan or section 1141 of

the Bankruptcy Code.

## ARTICLE 9 EVENTS OF DEFAULT AND EFFECT THEREOF

Any creditor remedies allowed by section 1112(b)(4)(N) of the Bankruptcy

Code shall be preserved to the extent otherwise available at law. In addition to any

rights specifically provided to a claimant treated pursuant to this Plan, a failure by

the reorganized Debtor to make a payment to a creditor pursuant to the terms of this

Plan shall be an event of default as to such payments not cured within ten (10) days after mailing written notice of default from such creditor to the reorganized Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the following:

To:             Ashmark Construction, LLC
                c/o Martin Renel
                5640 W. Maple, Suite 300
                West Bloomfield, MI 48322
                martin@ashmark.com

With a Copy To: Taft Stettinius & Hollister, LLP
                c/o Kimberly Ross Clayson Anthony M. Cimini
                27777 Franklin Rd, Suite 2500
                Southfield, MI 48034
                kclayson@taftlaw.com
                acimini@taftlaw.com

## ARTICLE 10: TAX CONSEQUENCES

Debtor is unable at this time to fully determine the effect that the proposed Plan will have upon its tax attributes. Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this

summary of federal income tax consequences.

## ARTICLE 11: LEGAL REQUIREMENTS

### 11.01 Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, which are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Class 1 is not impaired and not entitled to vote on the Plan.

Class 2 is impaired and is entitled to vote on the Plan.

Class 3 is impaired and is entitled to vote on the Plan.

Creditors that hold claims in more than one (1) impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one (1) class and who has not been provided with enough ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before he bar date set by the Court for the filing of proofs of claim (except for certain claims

21

expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**11.02 Confirmation**

Confirmation of a plan under Chapter 11, Subchapter V of the Bankruptcy Code is governed by section 1191 of the bankruptcy code.

**(a) Requirements for Consensual Confirmation**

Confirmation pursuant to section 1191(a) of the Bankruptcy Code is treated as a consensual confirmation. Confirmation under this subsection provides that the court shall confirm a plan if the Plan meets all of the requirements of section 1129(a) of the Bankruptcy Code except for paragraph 15 of that subsection are met.

Sections 1129(a) and 1129(b) of the Bankruptcy Code establish conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under section 1129(a) of the Bankruptcy Code are these:

1. Each class of impaired creditors and interests must accept the plan, as described in paragraph A above.

2. Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

**(b) Requirements for Confirmation without Consent**

23

Docusign Envelope ID: 0ECB15EB-0687-48E2-919A-AF9C8DAD82EF

Since Debtor filed for bankruptcy protection under Chapter 11, Subchapter V of the Bankruptcy Code, Debtor may also confirm the Plan without consent pursuant to the requirements of Section 1191(b) of the Bankruptcy Code. Section 1191(b) of the Bankruptcy Code requires that Debtor meet all of the applicable requirements section 1129 of the Bankruptcy Code except for paragraphs (8), (10), and (15) of that section so long as the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under the Plan.

The Court will determine that the Plan is fair and equitable with respect to each class of claims or interests where it finds that the Plan has met the following requirements:

(i) With respect to a class of secured claims, the plan meets the requirements of section 1129(a)(2) of the Bankruptcy Code; and

(ii) As of the Effective Date of the Plan all of Debtor's projected disposable income to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make the Plan payments; or

(iii)     the value of the property to be distributed under the Plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning

Docusign Envelope ID: 0ECB15EB-0687-48E2-919A-AF9C8DAD82EF

on the date on which the first distribution is due under the plan is not less than Debtor's projected disposable income.

(iv)     The Plan is feasible, in that Debtor will be able to make all payments under the Plan or there is a reasonable likelihood that Debtor will be able to make all payments under the Plan and the Plan provides appropriate remedies to protect the holders of claims or interests in the event that payments are not made.

"Disposable income" is defined under the Bankruptcy Code to mean that income which is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of Debtor.

### 11.03 Modification/Withdrawal

The Debtor reserves the right to modify or withdraw the plan at any time before confirmation.

Pursuant to section 1193 of the Bankruptcy Code:

**If this plan is confirmed under section 1191(a)** of the Bankruptcy Code, Debtor may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan. Any such modified plan will become the Plan by court order confirming any modified plan and only after notice and a hearing on such modification.

**If this plan is confirmed under section 1191(b)** of the Bankruptcy Code, Debtor may modify the Plan at any time within 3 years, or such longer time not to exceed 5 years. Any such modified plan will become the Plan by court order confirming any modified plan and only after notice and a hearing on such modification.

## ARTICLE 12: GENERAL PROVISIONS

**12.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

**12.02 Effective date.** The effective date ("Effective Date") of this Plan is the day that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

**12.03 Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**12.05 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

Docusign Envelope ID: 0ECB15EB-0687-48E2-919A-AF9C8DAD82EF

**12.06 Controlling effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Illinois govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**12.07 Retention of Jurisdiction.** The court confirming the Plan may exercise jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

Respectfully submitted by,

**TAFT STETTINIUS & HOLLISTER, LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road Suite 2500
Southfield, Michigan 48034
248-351-3000
kclayson@taftlaw.com

*Counsel to the Debtor, Ashmark Construction, LLC*

27

Signed by:

0937135A8A2E427...

By: /s/ Martin Renel

Martin Renel

November 12, 2025

For: Ashmark Construction, LLC

Dated: November ___, 2025

Its: Responsible Person and
Managing Member

28

**EXHIBIT 1**

In re:

Ashmark Construction, LLC,

Debtor.

_____/

Case No. 25-46693-tjt

Chapter 11, Subchapter V

Hon. Thomas J. Tucker

### *FIRST AMENDED*
### CHAPTER 11, SUBCHAPTER V PLAN OF REORGANIZATION
### ~~DATED SEPTEMBER 29, 2025~~

Ashmark Construction, LLC, debtor and debtor-in-possession in the above

captioned case ("Debtor" or "Ashmark"), by and through its attorneys, files this

*First Amended Chapter 11, Subchapter V Plan of Reorganization* (hereinafter, the

"Plan" which incorporates by reference *Chapter 11, Subchapter V Plan of*

*Reorganization Dated September 29, 2025* [ECF No. 49] (the "First Plan")~~.~~[1] and

its exhibits).[2] In support, the Debtor respectfully states as follows:

**THE PLAN AS AMENDED HEREIN PROPOSES AN INCREASE IN**

**DISTRIBUTIONS TO CLASS 2 CREDITORS AND HAS NO MATERIAL**

**ADVERSE IMPACT ON CREDITORS OR PARTIES IN INTEREST.**

---

[1] This Plan shall govern to the extent of any conflict with the provisions set forth herein and the First Plan.

[2] Attached hereto as **Exhibit 1** is a redline copy of the Plan reflecting changes from the First Plan.

1

**THEREFORE, THE COURT'S *AMENDED NOTICE OF ORDER ESTABLISHING DEADLINES AND PROCEDURES IN A SUBCHAPTER V CASE* [ECF NO. 64] (THE "AMENDED SCHEDULING ORDER") REMAINS IN EFFECT. PLEASE REFER TO THE AMENDED SCHEDULING ORDER REGARDING DEADLINES APPLICABLE TO CONFIRMATION OF THE PLAN.**

### A. Description and History of the Debtor's Business

#### 1. Nature and History of Debtor's Business

Ashmark is a Michigan limited liability company formed for the purpose of providing construction project management services for the build-out of commercial properties with a primary focus on retail locations and professional office space. Ashmark's revenue is derived from fees it charges to customers for its construction project-management services net of subcontractor costs. Other than its operating cash, Ashmark has minimal assets to perform its services for clients and its value as a business is primarily held in its customer goodwill.

#### 2. Legal Structure of the Ownership of Debtor

Ashmark is comprised of three full-time employees and three members: the Ashley J. Israel Revocable Living Trust (the "Israel Trust"), the Marc S. Weinbaum Revocable Living Trust (the "Weinbaum Trust"), and Martin Renel ("Renel" and together with the Israel Trust and the ~~Weibaum~~Weinbaum Trust, the

2

"Members"). Renel is Ashmark's managing member ("Manager"), he is the responsible person for the Debtor and the only member who is also employed by Ashmark. The membership of Ashmark is made up of two classes: Class A, comprised of its members – the Israel Trust (33.33%), the Weinbaum Trust (33.34%), and Renel (28.33%); and Class B, comprised of its Manager – Renel (5%).

### 3. Events Leading to the Filing of Debtor's Chapter 11 Case

For over 20 years, Ashmark has been a successful and profitable company, and up until the recent legal disputes described herein, it operated its business free from controversy other than its own customer collection matters. Ashmark sought bankruptcy protection under Chapter 11, Subchapter V of the Bankruptcy Code in the wake of two litigation matters: (1) a state court judgment (the "Pennington Judgment")[1][3] in favor of its former customer, Richard Pennington ("Pennington"); and (2) pending arbitration litigation with M1 Concourse, LLC ("M1").[2][4]

*Pennington Litigation and Judgment Put Operations at Risk*

---

[1][3] The Pennington Judgment was entered on June 13, 2025 in the State of Michigan, Oakland County Circuit Court Case No. 2023-198433-CZ (the "State Court Judgment").

[2] The [4] M1 is an 87-acre motorsports venue that also houses private "car condos" for vehicle storage in temperature-controlled spaces that include car-lifts, and include kitchenettes, full bathrooms, and other accommodations.

3

The Pennington Judgment arose from a construction project for which Pennington contracted with Ashmark to complete a custom build-out of a car condominium unit at M1 (the "Project"). During the Project, various disagreements arose between Pennington and Ashmark regarding the scope and cost of the Project. Following a bench trial, judgment was entered against Ashmark and in Pennington's favor in the principal amount of $~~256,258.06 for amounts the court held were damages for Pennington's overpayment on the Project plus interest on the overpayments~~222,736.46[5] plus judgment interest of $23,521.60 for a total of $246,258.06.

### *M1 Litigation Further Constrained Ashmark's Finances*

The M1 litigation arose from a dispute over the terms of a Master Subcontractor Agreement (the "Agreement") related to developer fees that M1 alleges Ashmark owes for construction project management services that Ashmark performed for certain M1 car condominium owners. Ashmark has asserted counter-claims against M1 on unjust enrichment grounds for overpayment of developer fees on its mistaken belief that the Agreement was enforceable and in particular, related to Ashmark's payments to M1 that were made after the Agreement would have expired under its terms if it ever were in

---

[5] This amount reflects what the court determined were damages for Pennington's overpayment to Ashmark for its services in connection with the Project.

effect. M1 has claimed damages against Ashmark in the amount of $283,593.93 and Ashmark has claimed damages against M1 in the amount of $276,056.38.

### *Pennington Judgment and M1 Litigation Precipitated Bankruptcy Filing*

Ashmark sought bankruptcy protection because it did not have sufficient cash or assets on hand to satisfy the Pennington Judgment and to continue to operate its business without material interruption. Ashmark determined its only options to resolving the Pennington Judgment were to file for bankruptcy protection or go out of business upon Pennington's enforcement of his judgment remedies e.g. bank account garnishments. A bank garnishment posed serious risk of wiping out all of Ashmark's operating cash and would expose its customers to the risk that, at any time, customer deposits intended for payment of subcontracted construction services could be swept for a garnishment, which would have deepened Ashmark's insolvency. Rather than face that risk, Ashmark presents this Plan which will provide payments to creditors while allowing Ashmark to continue its operations.

### 4. Significant Events During the Bankruptcy Case

There have been no significant events that have occurred during this Bankruptcy Case. Ashmark has no secured creditors with an interest in its cash, therefore Ashmark did not require relief from the court for use of cash collateral, its employee wages were up to date on the Petition Date and there have been no

outside the ordinary course transactions.

**B.      Plan Funding Sources**

The Debtor will fund the payment of (a) all administrative expense claims; and (b) creditor claims described in this Plan. The source of Debtor's Plan funding will be member contributions, to the extent required and Debtor's disposable income from the ongoing operation of Debtor's business.

**C.      Management of Debtor Following Plan Confirmation**

Following confirmation of the Plan, Debtor will be operated by Renel—Ashmark's managing member. Renel's continued management of Debtor is consistent with the interests of creditors and equity security holders and with public policy. Renel is in the best position to maximize Ashmark's goodwill as he has served as the face of Ashmark's customer relationships since its inception. As compensation for services Renel will be paid an annual salary of $118,000. Additionally, Debtor will continue to pay for Renel's use of a company vehicle and will reimburse Renel's expenses that are reasonable and necessary for Renel to perform his job duties for Debtor.

**D.      Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity

6

interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest holders would receive in a chapter 7 liquidation. The liquidation analysis required by Section 1190 of the Bankruptcy Code[36] is attached to the First Plan as **Exhibit A**.

### 1. Projected Recovery of Avoidance Actions

The Debtor has reviewed its prepetition transfers made within the preference period and has not identified any potential preference claims that would realize cash to fund the Plan. Notwithstanding, the Debtor reserves the authority to pursue through an adversary proceeding any preference claim that has not yet been identified. Any such proceeds recovered after confirmation will be used to fund the obligations under the Plan.

### 2. Insider Transactions

The Debtor's insiders consist of the Members (collectively, the "Insiders"). The Insiders received the following payments from the Debtor :

Israel Trust          January 9, 2024     $25,000.00   Profit Distribution

Weinbaum Trust   January 9, 2024     $25,000.00   Profit Distribution

---

[36] The "Bankruptcy Code" shall mean Title 11, United States Code, Section 101 *et. seq.*

7

| | | | |
|---|---|---|---|
| Martin Renel | January 9, 2024 | $50,000.00 | Profit Distribution |
| Martin Renel | July 1, 2024-<br>June 30, 2025 | $79,719.63 | Salary |

(the "Insider Payments"). The Insider Payments that are attributed to Profit Distributions were made at a time when Ashmark was solvent and the Profit Distributions did not render Ashmark insolvent. The Insider Payments that are attributed to Salary were made in consideration of Renel's services to Ashmark as its manager. Renel performs services including the day-to-day operations of Ashmark and the Salary is reasonable.

### 3. Other Causes of Action

Ashmark may require to continue the M1 litigation through arbitration in order to determine the liquidated amount of M1's claim, if any, as well as for Ashmark to liquidate its claim against M1. Therefore, Ashmark preserves all of its claims against M1. Other than the M1 lawsuit, Ashmark does know of any other causes of action that may be available to it. However, that there are no known causes of action is not a waiver of any existing claims or causes of action that Ashmark may discover at any time. Furthermore, Ashmark reserves all right title and interest to any claims or causes of action that it may discover. As of the Effective Date (as defined in Article 12 Section 2 below), the post-confirmation injunction shall be waived solely with respect to the M1 litigation so the parties

may continue the arbitration.

### 4. Ability to Make Future Plan Payments and Operate Without Further Reorganization

Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. Projections that support the Debtor's ability to make all payments required by the Plan are attached to the First Plan as **Exhibit B.** *See* Section 1190 of the Bankruptcy Code.

Ashmark's financial projections show that the it will have projected disposable income (as defined by Section 1191(d) of the Bankruptcy Code) for the period described in Section 1191(c)(2) of the Bankruptcy Code in the amount of $142,243.00.

The final Plan payment is expected to be paid on or about January 15, 2029.

In addition to contributing Ashmark's projected disposable income for the 3-year post-confirmation period to the Plan, Ashmark or its members will contribute an additional $225,000 in three annual installments of $75,000 to be paid on January 15, 2026, January 15, 2027 and January 15, 2028 (the "Additional Unsecured Creditor Distribution").[7]

---

[7] This additional payment assumes arguendo that the profit distributions that Ashmark's members received more than two years prior to the Petition Date

9

# ARTICLE 1: SUMMARY

This Plan under chapter 11 subchapter V of the Bankruptcy Code proposes to pay creditors of Ashmark from its operating profits over the period of 3 years plus the Additional Unsecured Creditor Distribution. Distributions of the projected disposable income to Class 2 Non-Priority Unsecured Creditors will be made on a quarterly basis with the first distribution to be made on April 15, 2026 and with each subsequent distribution to be made on the 15th of each month following each calendar quarter with the final distribution estimated to occur on or before January 15, 2029. The Additional Unsecured Distribution will be paid in three annual installments as described herein above.

This Plan provides for:

1.01    ~~Payment of secured claims. GM Financial.~~

~~1.02~~1.01    **Payment of non-priority unsecured claims.** Non-priority unsecured creditors holding allowed claims will receive pro rata distributions from a total projected disposable income of $142,243.00 plus the Additional Unsecured Creditor Distribution, or $225,000, to be contributed by Ashmark or its members for a total distribution to unsecured creditors of $367,243.00. If unsecured claims are deemed allowed claims in the amount that Debtor has

would have been reduced by the amount of $222,736.46 which the state court found to be the amount of Pennington's overpayment to Ashmark.

10

estimated such claims herein below, the Plan will provide creditors a distribution that amounts to ~~approximately 28~~between 57 and 100 cents on the dollar.[8] However, if the Debtor's allowed administrative expense claims exceed $100,000, the Debtor's Plan payments shall first be applied to the satisfaction of its allowed administrative expenses in excess of $100,000 and in such case, distributions to Ashmark's unsecured creditors will be reduced by a corresponding amount (the "Administrative Carve-Out").

**1.03 Payment of administrative expenses and priority claims:** This Plan provides for full payment of administrative expenses and priority claims. Administrative expenses are estimated as follows: Subchapter V Trustee (the "Trustee") $7,500.00; and Debtor's Counsel, Taft Stettinius & Hollister, LLP ("Counsel") $75,000, UHY Advisors, Inc., $20,000 ("Administrative Expenses"). Payment of the Administrative Expenses is subject to court approval upon the timely request of the Trustee and Counsel. The Debtor has a retainer deposit balance of $15,000 and sufficient cash on hand from which to pay Administrative Expenses in full.

---

[8] If Pennington's claim is allowed in the full amount of his Proof of Claim No. 4-1, or $349,975.26, but subject to the Administrative Carve-Out (*see* Article 1, Section 1.03). Because, if Ashmark prevails in arbitration with respect to M1 (*see* Article 2, Class 2), Pennington will receive payment in full on account of his claim however, Ashmark reserves the right to object to the amount of his claim.

All creditors and equity security holders should refer to Articles 2 through 6 of this Plan for information regarding the precise treatment of their claim.

## ARTICLE 2: CLASSIFICATION OF CLAIMS AND INTERESTS

**2.01   Class 1.** Secured Claim of AmeriCredit Financial Services, Inc. d/b/a GM Financial ("<u>GM Financial</u>"). **Not Impaired. Not entitled to vote on the plan.**

Amount of claim:                          $  4,117.10

Estimated Value of Collateral:   $  15,179.00 to 24,650.00[49]

~~Ashmark has an auto loan for the use of a 2019 Chevrolet Silverado that is used by its employee and project manager. Ashmark will pay GM Financial according to its original loan contract terms which include payment of interest calculated under its note for 5.20 percent.~~

*GM Financial was satisfied on its claim pursuant to the Court's Order Granting Debtor's Motion for Entry of an Order to Purchase Vehicle Outside Ordinary Course of Business, Trade in Vehicle, and Pay Off Lien, and Cancelling October 29, 2025 Hearing* [ECF No 70].

**2.02   Class 2.** All non-priority unsecured claims allowed under section 502 of the Bankruptcy Code. **Impaired. Entitled to vote on the plan.**

There are two non-priority unsecured creditors, Pennington and M1. ~~Each~~

---

[49] Debtor estimated the value of the collateral in its schedules as $15,179 and GM Financial estimated the value of its collateral at $24,650 in its proof of claim. In either case, GM Financial is fully secured.

of the creditors' claims have been listed by Debtor in its schedules as disputed, unliquidated and contingent. The unsecured creditors' claims will be deemed as disallowed and not entitled to vote on the Plan until such time that the creditors timely file their proofs of claim. In the event that timely proofs of claim are filed, the unsecured creditors' claims will be deemed allowed for Plan voting purposes only. Debtor reserves the right to later object to the validity and the amount of the filed claims. If, hypothetically, the claims as scheduled were treated as allowed claims, Pennington's claim as scheduled is $222,736.46 (which is the amount of his judgment against Debtor)State Court Judgment amount is 246,258.06 and M1's claim is $283,583.93[10], and is disputed and contingent upon the final result of arbitration and subject to setoff by Ashmark's claim against it of $276,056.38. Distributions are subject to the Administrative Carve Out (*see* Article 1, Section 1.01).

If, hypothetically, Ashmark's claim against M1 is reduced to $0.00 and M1 is granted an arbitration award in the face amount of its demand, then the pro rata percentage allocation of Pennington's claim (if allowed) to M1's claim is as follows:[5][11]

_____

[10] However, Pennington filed a claim in the amount of $349,975.26 without sufficient documentation for Ashmark to determine the validity in the amount of Pennington's proof of claim (*see* Proof of Claim No. 4-10).

_____

[5][11] This pro rata claim allocation is subject to final adjustments for other allowed general unsecured claims or according to the final allowed amount of the M1 and

13

~~44~~46 percent: Pennington

~~56~~54 percent: M1

If Pennington's claim is allowed, then Ashmark will make a pro rata distribution to Pennington on account of his claim and calculated on the hypothetical allowance of the M1 claim in its entire amount without setoff for Ashmark's claim against M1. Ashmark will make a pro rata distribution attributed to M1's claim into an escrow account that will be disbursed based on one of the following outcomes: (a) ~~no amount will be paid to M1 if it fails to timely file its proof of claim, in such case, Debtor will seek and should be entitled to dismissal of M1's claims from arbitration however, in such event, Ashmark reserves the right to pursue its counter-claims against M1; (b)~~ in full to M1 upon entry of an arbitration award in M1's favor and denying Ashmark's counter-claim in full; (~~c~~b) in part to M1 based on a re-calculated pro-rata distribution to M1 upon entry of an arbitration award in M1's favor less any arbitration award in favor of Ashmark; or (~~d~~c) no distribution will be made to M1 provided the arbitration award to Ashmark is greater than the arbitration award, if any, to M1. In all circumstances, Ashmark reserves the right, but not the obligation, to compromise and settle M1's

general unsecured claims or according to the final allowed amount of the M1 and Pennington general unsecured claims.

14

claims without arbitration and Ashmark may then allocate Plan payments between M1 and Pennington (if allowed) according to the above described disbursement terms for M1's compromised claim amount. Debtor will propose terms in its order confirming the Plan that allows for Ashmark to continue arbitration with M1 unless otherwise settled or compromised.

If M1's claim is reduced or disallowed as described above then any residual escrow account balance, up to the full amount of the escrow balance will be disbursed to Pennington on account of his claim to the extent that his claim is deemed allowed. Any surplus amount on deposit in the escrow account in excess of Pennington's allowed claim, subject to Ashmark's right to object to the amount of Pennington's claim, will be retained by Ashmark.

Plan payments that come due, if at all, after the conclusion of the M1 arbitration, will be paid directly to M1 based on the final pro-rata calculation of M1's claim.

or

Any difference in the pro-rata plan payment amount that would have been paid to M1 will instead be paid to Pennington up to 100 percent of his claim, if his claim is deemed allowed.

If Ashmark receives an arbitration award greater than any amount awarded to M1, upon Ashmark's receipt of payment from M1 of such award, Ashmark will

first apply any recovery from M1 to payment of Ashmark's legal expenses attending to its representation in the M1 arbitration proceeding and any subsequent collection costs it may incur, Ashmark will retain at least 50 percent of any net arbitration award receipt and will disburse up to 50 percent of any net arbitration award receipt to Pennington if his claim is deemed allowed but only to the extent that it fully satisfies the allowed amount of his claim.

**2.03   Class 3.** Equity interests of the Debtor. **Impaired. Entitled to vote on the plan.**

On the Effective Date of the Plan, the Members, will retain their membership interests in Ashmark according to their current percentage allocation of membership. Notwithstanding their retention of membership interests, all projected disposable income which would otherwise be profit of Ashmark due to its members, will instead  be disbursed to Class 2 creditors for the life of the Plan. In addition to Ashmark's projected disposable income, Ashmark or its members will also contribute $225,000  in three annual installments of $75,000 as described herein (*see* Article 1, Section 1.01). Except that nothing in this Plan is intended to nor does it create liability of Ashmark's members to its creditors as identified in the Plan or any unknown or future creditors of Ashmark.

**ARTICLE 3: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS, AND QUARTERLY AND COURT FEES**

**3.01: Unclassified claims.** Under section 1123(a)(1) of the Bankruptcy

Code, allowed administrative expenses and priority tax claims are not classified claims.

**3.02: Administrative expenses.** Administrative Expenses allowed under section 503 of the Bankruptcy Code will be paid in full upon court approval of the same following confirmation of the Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

**3.03: Priority tax claims.** Other than employee withholding taxes that have accrued and been paid in the ordinary course of business, there are no priority tax claims due to be paid under the Plan.

## ARTICLE 4: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**4.01 Claims and interests are treated as follows under this Plan:**

## ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.01 Disputed claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either:

(a) A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

**5.02: Delay of distribution on a disputed claim.** No distribution will be made on account of a disputed claim unless and until it is allowed.

**5.03: Settlement of disputed claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9019.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.01 Assumption/Rejection of Leases and Contracts

The Debtor assumes, and if applicable assigns to the reorganized Debtor, the executory contracts and unexpired leases as of the effective date of the Plan that are identified in the attached **Exhibit C**.

### 6.02 Deadline to File Claims for Rejected Leases and Executory Contracts

Except for executory contracts and unexpired leases that have been assumed, and if applicable, assigned pursuant to this Plan and an order confirming the Plan, will be conclusively deemed rejected as of the Effective Date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 14 days after the date on which the court enters the order confirming this Plan.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Debtor will implement the plan by continuing its usual business operations as a construction manager. Debtor will fund the plan by dedicating its projected disposable income over a period of three years plus the Additional

18

Unsecured Creditor Distribution.

## ARTICLE 8: EFFECT OF CONFIRMATION OF PLAN AND INJUNCTION

### 8.01 Discharge

If the Debtor's Plan is confirmed under section 1191(a) of the Bankruptcy Code, on the ~~effective date~~<u>Effective Date</u> of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt:

> (i) imposed by this Plan; or
>
> (ii) to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

If the Debtor's Plan is confirmed under section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in section 1192 of the Bankruptcy Code. The Debtor will not be discharged from any debt:

> (i) on which the last payment is due after the first 3 years of the plan, or as otherwise provided in section 1192 the Bankruptcy Code; or
>
> (ii) excepted from discharge under section 523(a) of the Bankruptcy

19

Code, except as provided in Bankruptcy Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

**8.02 Binding Effect of Plan.**

Upon the Effective Date (defined below), the Plan and each of its provisions shall be binding on Debtor, all Creditors, all Equity Interest holders, and all Persons acquiring property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or Equity Interest held by any of them is Impaired under the Plan, whether or not any Claim or Equity Interest held by any of them is Allowed in full, only in part, or Disallowed in full, and whether or not a Distribution is made to any of them under the Plan. This provision includes all successors and assigns of the parties named herein.

**8.03 Vesting of Assets.**

Upon the Effective Date, all assets of Debtor's shall vest in the Debtor, except as otherwise provided in the Plan.

**8.04 Injunction**

Confirmation of the Plan will result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against

20

Debtor that arose prior to the Confirmation Date, unless such action is authorized by the Plan or section 1141 of the Bankruptcy Code.

## ARTICLE 9 EVENTS OF DEFAULT AND EFFECT THEREOF

Any creditor remedies allowed by section 1112(b)(4)(N) of the Bankruptcy Code shall be preserved to the extent otherwise available at law. In addition to any rights specifically provided to a claimant treated pursuant to this Plan, a failure by the reorganized Debtor to make a payment to a creditor pursuant to the terms of this Plan shall be an event of default as to such payments not cured within ten (10) days after mailing written notice of default from such creditor to the reorganized Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the following:

To:        Ashmark Construction, LLC
c/o Martin Renel
5640 W. Maple, Suite 300
West ~~Bloomfiled~~Bloomfield, MI 48322
martin@ashmark.com

With a Copy To:    Taft Stettinius & Hollister, LLP
c/o Kimberly Ross Clayson Anthony M. Cimini
27777 Franklin Rd, Suite 2500
Southfield, MI 48034
kclayson@taftlaw.com
acimini@taftlaw.com

## ARTICLE 10: TAX CONSEQUENCES

Debtor is unable at this time to fully determine the effect that the proposed Plan will have upon its tax attributes. Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## ARTICLE 11: LEGAL REQUIREMENTS

### 11.01 Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, which are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Class 1 is not impaired and not entitled to vote on the Plan.

Class 2 is impaired and is entitled to vote on the Plan.

Class 3 is impaired and is entitled to vote on the Plan.

Creditors that hold claims in more than one (1) impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one (1) class and who has not been provided with enough ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before he bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

23

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**11.02 Confirmation**

Confirmation of a plan under Chapter 11, Subchapter V of the Bankruptcy Code is governed by section 1191 of the bankruptcy code.

**(a) Requirements for Consensual Confirmation**

Confirmation pursuant to section 1191(a) of the Bankruptcy Code is treated as a consensual confirmation. Confirmation under this subsection provides that the court shall confirm a plan if the Plan meets all of the requirements of section 1129(a) of the Bankruptcy Code except for paragraph 15 of that subsection are met.

Sections 1129(a) and 1129(b) of the Bankruptcy Code establish conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under section 1129(a) of the Bankruptcy Code are these:

24

1. Each class of impaired creditors and interests must accept the plan, as described in paragraph A above.

2. Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

### (b) Requirements for Confirmation without Consent

Since Debtor filed for bankruptcy protection under Chapter 11, Subchapter V of the Bankruptcy Code, Debtor may also confirm the Plan without consent pursuant to the requirements of Section 1191(b) of the Bankruptcy Code. Section 1191(b) of the Bankruptcy Code requires that Debtor meet all of the applicable requirements section 1129 of the Bankruptcy Code except for paragraphs (8), (10), and (15) of that section so long as the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under the Plan.

The Court will determine that the Plan is fair and equitable with respect to each class of claims or interests where it finds that the Plan has met the following requirements:

(i) With respect to a class of secured claims, the plan meets the requirements of section 1129(a)(2) of the Bankruptcy Code; and

(ii) As of the Effective Date of the Plan all of Debtor's projected disposable income to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make the Plan payments; or

(iii)    the value of the property to be distributed under the Plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than Debtor's projected disposable income.

(iv)    The Plan is feasible, in that Debtor will be able to make all payments under the Plan or there is a reasonable likelihood that Debtor will be able to make all payments under the Plan and the Plan provides appropriate remedies to protect the holders of claims or interests in the event that payments are not made.

"Disposable income" is defined under the Bankruptcy Code to mean that income which is not reasonably necessary to be expended for the payment of

expenditures necessary for the continuation, preservation, or operation of the business of Debtor.

### 11.03 Modification/Withdrawal

The Debtor reserves the right to modify or withdraw the plan at any time before confirmation.

Pursuant to section 1193 of the Bankruptcy Code:

**If this plan is confirmed under section 1191(a)** of the Bankruptcy Code, Debtor may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan. Any such modified plan will become the Plan by court order confirming any modified plan and only after notice and a hearing on such modification.

**If this plan is confirmed under section 1191(b)** of the Bankruptcy Code, Debtor may modify the Plan at any time within 3 years, or such longer time not to exceed 5 years. Any such modified plan will become the Plan by court order confirming any modified plan and only after notice and a hearing on such modification.

## ARTICLE 12: GENERAL PROVISIONS

**12.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan,

and they are supplemented by the following definitions:

**12.02 Effective date.** The effective date ("<u>Effective Date</u>") of this Plan is the day that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

**12.03 Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**12.05 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**12.06 Controlling effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Illinois govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**12.07 Retention of Jurisdiction.** The court confirming the Plan may exercise jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's

28

construction, implementation, or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

Respectfully submitted by,

**TAFT STETTINIUS & HOLLISTER, LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road Suite 2500
Southfield, Michigan 48034
248-351-3000
kclayson@taftlaw.com

*Counsel to the Debtor, Ashmark Construction, LLC*

By:    /s/ Martin Renel
        Martin Renel
For:   Ashmark Construction, LLC
Dated: ~~September 29,~~November __, 2025
Its:   Responsible Person and Managing Member

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 11/11/2025 3:26:48 PM | |
|---|---|
| **Style name:** TaftStandard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://taft-mobility.imanage.work/ACTIVE/195592178/1 | |
| **Modified DMS:** iw://taft-mobility.imanage.work/ACTIVE/195592178/2 | |
| **Changes:** | |
| Add | 71 |
| Delete | 36 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 111 |